42 F.3d 836
 UNITED STATES of America, Plaintiff-Appellee,
v.
Louis T. MANCUSO, Defendant-Appellant (Two Cases).
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert S. SCHMIDT, Defendant-Appellant (Two Cases).
UNITED STATES of America, Plaintiff-Appellee,
v.
Susan L. MANCUSO, Defendant-Appellant (Two Cases).
UNITED STATES of America, Plaintiff-Appellee,
v.
R. Philip HARTMAN, Defendant-Appellant (Two Cases).
UNITED STATES of America, Plaintiff-Appellee,
v.
HARTMAN RACK PRODUCTS, INCORPORATED, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellant,
v.
Louis T. MANCUSO, Robert S. Schmidt; Susan L. Mancuso; R.
Philip Hartman; Hartman Rack Products,
Incorporated, Defendants-Appellees.
 Nos. 92-5819, 92-5831, 92-5832, 92-5841, 92-5842, 93-5011 to
93-5014 and 93-5123.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 6, 1993.
Decided Nov. 9, 1994.
 
 ARGUED: Thomas Courtland Manning, Cheshire, Parker & Manning, Raleigh, NC, for appellant Louis Mancuso; Roger William Smith, Tharrington, Smith & Hargrove, Raleigh, NC, for appellants Hartman and Hartman Rack Products; Franklyn M. Gimbel, Gimbel, Reilly, Guerin & Brown, Milwaukee, WI, for appellant Schmidt; Edwin Chrisco Walker, Asst. Federal Public Defender, Raleigh, NC, for appellant Susan Mancuso. Scott L. Wilkinson, Asst. U.S. Atty., Raleigh, NC, for appellee. ON BRIEF: Robert M. Hurley, Cheshire, Parker & Manning, Raleigh, NC, for appellant Louis Mancuso; Douglas A. Ruley, Tharrington, Smith & Hargrove, Raleigh, NC, for appellants Hartman and Hartman Rack Products; Kathryn A. Keppell, Gimbel, Reilly, Guerin & Brown, Milwaukee, WI, for appellant Schmidt. James R. Dedrick, U.S. Atty., Raleigh, NC, for appellee.
 Before ERVIN, Chief Judge, MICHAEL, Circuit Judge, and SPROUSE, Senior Circuit Judge.
 Convictions affirmed, sentences affirmed in part and vacated and remanded in part by published opinion. Chief Judge ERVIN wrote the opinion, in which Judge MICHAEL and Senior Judge SPROUSE joined.
 OPINION
 ERVIN, Chief Judge:
 
 
 1
 Louis Mancuso, Susan Mancuso, Philip Hartman, Hartman Rack Products, Inc. and Robert Schmidt bring a direct appeal for review of their criminal convictions and sentences for bank fraud in violation of 18 U.S.C. Sec. 1344, conspiracy to defraud the United States in violation of 18 U.S.C. Sec. 371, and making false statements to a federally-insured financial institution, in violation of 18 U.S.C. Sec. 1014. For the reasons set out below, we affirm each of the convictions. Finding error in the district court's interpretation of the United States Sentencing Guidelines, however, we vacate the sentences of Louis and Susan Mancuso and remand for resentencing. We affirm the sentences of Robert Schmidt and Philip Hartman.
 
 I.
 
 2
 The facts of this case are long and complex, and due to the nature of several of the matters appealed, it is necessary to lay them out in detail. Louis Mancuso (Mancuso) was the president and sole shareholder of two companies, Precision Erectors, Inc. (Precision) and Piedmont Installers, Inc. (Piedmont), which installed automated storage retrieval systems. Apparently a manufacturer of storage retrieval systems would close a contract with a company needing its product, and then would hire another company, such as Precision, to do the installation work. Susan Mancuso is Mr. Mancuso's wife and the secretary and treasurer for Precision and Piedmont, and was responsible for maintaining their books and records and for depositing checks. The companies were maintained in Youngsville, N.C.
 
 
 3
 By 1989, the Mancusos' business had fallen on hard times, and the companies had accumulated debts to their commercial lending bank, the First Federal Savings and Loan Association of Raleigh (FFSLAR), totalling $798,500. Over the course of 1989, Mancuso entered into negotiations with FFSLAR to restructure the relationship with FFSLAR, which resulted in two agreements executed in October 1989. First, the Mancusos received a "workout" loan from FFSLAR of $798,500 that consolidated all the previous loans. The security for this loan included a series of life insurance policies, real property mortgages, chattel property and "all present accounts receivable now owned and hereafter acquired due from contractors now in process." Both Mr. and Mrs. Mancuso accepted this loan by signing the offer on October 6, 1989. The loan was to have a term of one year.
 
 
 4
 On the same day, the Mancusos entered into a second loan arrangement with FFSLAR ("the master agreement"). This agreement established a revolving line of credit, also with a one-year term, to finance future projects and to generate funds to repay the workout loan. The revolving line of credit was somewhat complex in its terms. It had a total loan limit of $500,000, and a per contract limit of $250,000, with no more than 5 contracts being financed at any time. The master agreement contained a rollover provision so that if a contract required a loan greater than $250,000, the Mancusos could borrow $250,000, repay that entire amount and then draw down the line of credit again for the same contract. Although it is not stated anywhere in the contract, testimony at trial indicated that the parties understood that the Mancusos could not draw down an amount for any contract that exceeded 75% of the contract value.[1]
 
 
 5
 Under the master agreement, each separate loan to finance a new contract was to be secured by a lien on the particular job contract for which financing was provided. The lien gave the bank the right to receive 100% of the proceeds under the job contract, even though the bank would lend only up to the lesser of 75% or $250,000 of the contract value; the remaining amount would be used to pay interest on the line of credit draft, and interest and principal on the workout loan. Pursuant to the commitment letter, the Mancusos agreed that all checks due as a result of work performed under contracts financed through the line of credit would be made jointly payable to Precision (or Piedmont) and FFSLAR. Although initially these payments were sent by the contractor to the Mancusos, beginning in late spring of 1990 the bank instituted a requirement that the funds be mailed directly to it.
 
 
 6
 For each loan tied to a new contract, Mancuso was required to execute a commitment letter stipulating that the security for the loan would be the assignment of the relevant job contract. Mancuso also executed a promissory note and a security agreement for each new loan. Once a loan was granted for a new contract, the party hiring Precision or Piedmont would receive a notice of assignment of rights, which they were required to acknowledge and return to FFSLAR. These notices informed the contractor to make payments jointly to FFSLAR and Precision or Piedmont, and, once the requirement that checks be sent directly to FFSLAR was implemented, provided the address to which they should be sent.
 
 
 7
 This criminal prosecution arose out of circumstances related to three major contracts that Piedmont entered into. As the facts related below indicate, the Mancusos and individuals at each of the contracting parties engaged in acts that diverted the funds due to FFSLAR under the contracts to the Mancusos directly, and then attempted to cover up the wrongdoing.
 
 A.
 
 8
 The Hartman Rack Products Contract. On May 11, 1990, Precision entered into a contract with Hartman Rack Products, Inc. (HRP) to install HRP systems at a Pratt & Whitney warehouse in Connecticut. HRP agreed to pay Precision $443,925 under the contract. To finance the project, Precision borrowed $250,000 under the FFSLAR line of credit. Pursuant to the master agreement, Precision, through Mancuso, assigned the proceeds of the HRP contract to FFSLAR as collateral for the loan, and executed an assignment of job contract that provided that checks from HRP were to be made out jointly and sent to FFSLAR directly; this agreement was sent to HRP and acknowledged by HRP at Philip Hartman's direction. Mr. Hartman was the president and majority owner of HRP.
 
 
 9
 On August 9, 1990, HRP sent its first payment under the contract, in the amount of $52,920, to FFSLAR, made out jointly to Precision and FFSLAR. Sometime in August after that date, Mancuso had a telephone conversation with FFSLAR loan officer Bill Robbins, the loan officer handling the Mancuso loans. The exact content of that conversation is in dispute. According to Mancuso's trial testimony, Robbins informed him that the Office of Thrift Supervision had placed restrictions on FFSLAR lending. Mancuso testified that Robbins told him that the bank had suspended all commercial lending on the orders of a regulatory agency,[2] and that there would be no further money available under the line of credit, including no money to complete the Pratt & Whitney job for HRP once the initial loan of $250,000 was repaid. Mancuso testified that he specifically asked Robbins whether he would be able to finance any future jobs under the line of credit, and was explicitly told he could not.
 
 
 10
 Mr. Robbins' recounting of that conversation is quite different. His testimony was that a major part of their conversation concerned the renewal of the workout loan and the master agreement to finance new projects, which were up for renewal at the end of September. He testified at trial that he told Mancuso that he did not know whether or under what conditions they would be renewed, but that he was going to try to get them renewed. Although at trial he stated that he told Mancuso that he "did not know at that moment what the status was on the line of credit," which lends some credence to Mancuso's story, Robbins continued the sentence by stating that "I was going to try to get it renewed if there was any way possible." In the second trial, this same issue came up, and the question and response were more explicit:
 
 
 11
 Q: Mr. Robbins, do you recall whether or not you made any statement to Mr. Mancuso regarding, as of August 1990, what the status of the line of credit was?
 
 
 12
 Mr. Wilkinson: Objection.
 
 
 13
 The Court: Objection's overruled.
 
 
 14
 The Witness: Regarding the status of the line of credit?
 
 
 15
 Mr. Manning: Yes, sir.
 
 
 16
 The Witness: The status of the line of credit was that it was still in full force and effect. If I had mentioned that to him I'm sure that it was an assumed thing because it hadn't matured.
 
 
 17
 Mancuso stated at trial that he "felt and was reasonably sure that First Federal had breached its contract under the major note agreement and particularly the line of credit agreement by refusing to extend me additional monies." He explains what he did next by indicating that he felt that, because of this breach, he was "entitled to receive the money directly since my obligations to the bank had been released through their breach, virtually cancelling all contracts I had with them."
 
 
 18
 Sometime after that conversation and before August 28, Mancuso called Hartman and requested HRP to send future payments directly to Precision, made payable only to Precision. Mancuso testified that if they did not do this, he would not be able to meet payroll, and would have to walk away from the contract. Hartman instructed his accounts payable person to comply and send future payments directly to Precision, payable only to Precision. Between August 28, 1990 and February 11, 1991, HRP sent ten checks directly to Precision, totalling $236,640. Each of these checks was deposited by Susan Mancuso.
 
 
 19
 In October 1990, FFSLAR's administrative assistant, Henri Bohl, called Hartman and asked for information regarding the status of outstanding invoices. Ten days later, Hartman sent her a document indicating the number of billed invoices from Precision to be only five, and reflecting payment only of the check initially cut to FFSLAR; it also did not reflect the fact that HRP had sent seven checks, totalling $166,000, directly to Precision since the initial check to FFSLAR had been sent. It did not indicate that three of the "unpaid" invoices in the document had already been paid to Precision.[3]
 
 
 20
 Again in January 1991, Bohl contacted Hartman, who indicated that he would be sending a $40,000-plus check the same week and the balance the next week. The checks were not sent, and Bohl called Mancuso on January 29, to see if he had received any checks from HRP directly. Mancuso stated that he had not received any checks from HRP, and that HRP was having financial difficulties. A week later, however, HRP sent another check, for $8,500, directly to Precision. On February 6, 1991, Bohl called HRP, and Hartman told another employee to tell her that HRP would send a check in excess of $110,000 by February 11. That check did not arrive; a day after refusing to speak with Bohl, however, Hartman sent a check for $51,140 to Precision. Bohl then sent a final request for payment to HRP, a copy of which she forwarded to Pratt & Whitney. FFSLAR finally received a check for $102,577.92. Thus, on the total contract of $443,925, FFSLAR received only $162,997.92; Precision received $236,640, none of which it was entitled to receive.[4]B.
 
 
 21
 The Harnischfeger Engineers, Inc. Contracts. In July 1990, Precision entered into a contract with Harnischfeger Engineers, Inc. (HEI) to install another storage retrieval system at the same Pratt & Whitney facility for $240,870. To finance the contract, Precision borrowed $150,000 under the line of credit, and Mancuso assigned all proceeds under the contract to the bank as collateral for the loan and executed an assignment form that was forwarded to HEI, notifying HEI to make checks jointly payable and to send them to FFSLAR. Defendant Robert Schmidt was the senior subcontract administrator at HEI responsible for negotiating the contract. He acknowledged the assignment notice and instructed the accounts department accordingly.
 
 
 22
 In early September, HEI sent two checks, totalling $78,030, directly to FFSLAR. On September 17, FFSLAR's Bohl spoke with Schmidt on a specific matter, identifying herself as a FFSLAR employee. One week later, Schmidt received a call and fax from Mancuso. Schmidt testified that Mancuso told him the bank had been taken over by the Office of Thrift Supervision (OTS) and closed, and that all future proceeds checks were to be sent directly to Precision, payable only to Precision. Mancuso also informed Schmidt that Precision did not have the funds to continue the project unless the invoices were paid directly to Precision, and that otherwise it would have to walk away from the job. Schmidt then instructed the accounts department to comply, without contacting FFSLAR or informing any superiors of this change. Thus, on October 16, 1990, HEI sent a check directly to Precision for $64,770.
 
 
 23
 Also in October, Precision entered into another job contract with HEI, in the amount of $176,000, for a Tropicana facility. It borrowed $132,000[5] from FFSLAR for this contract, and Mancuso executed all the requisite assignments and notices, printed on FFSLAR stationery. The assignment notice was then sent to the subcontract administrator at HEI handling the Tropicana contract, who was not familiar with the form and discussed it with Schmidt. They specifically discussed FFSLAR's involvement in this assignment in their conversation. The acknowledgement was signed and returned to FFSLAR. The accounts department then changed the payee for both contracts back to FFSLAR and Precision jointly.
 
 
 24
 On December 4, HEI prepared a check for $57,604.50 for the Pratt & Whitney contract that was made out to both Precision and FFSLAR; however, through the intervention of some individual, it was still sent directly to Precision, where Susan Mancuso deposited it into Precision's account. On December 21, another check, for $58,230 for the Tropicana contract, was issued, payable jointly; but Mancuso called the same day and told Schmidt that all future checks on all contracts should be made payable solely to Precision. The check already cut was voided and reissued, payable only to Precision, and Schmidt instructed the accounts payable department to make all further checks payable to Precision alone. Schmidt also received on that day a fax from Mancuso that included an article indicating that FFSLAR had been taken over by the RTC. It was clear from the article that FFSLAR was still operating. Schmidt claims that after reading the article, he realized that the bank was still operating and that he then left a note in the accounts payable department instructing them to change payment back to both FFSLAR and Precision. The note was never found, and no member of the department ever saw it. Four checks subsequently were sent directly to Precision, two under each contract. Four checks totaling $140,177.75 (out of a contract of $240,870) under the Pratt & Whitney contract, and three checks totaling $179,230.72 (out of a contract of $176,000)[6] under the Tropicana contract, were sent directly to Precision.
 
 
 25
 In January 1991, FFSLAR's Bohl began contacting Schmidt concerning the proceeds checks due under the contracts. On January 29, Bohl, who had spoken with Schmidt in September, identified herself as a FFSLAR employee and inquired into the delay in payment. Schmidt did not disclose the payments that had been made directly to Precision, but rather said that HEI hadn't paid because the work hadn't been completed yet. Bohl contacted Mancuso, who confirmed this, although he stated that the work was now complete and the payments should begin shortly. Bohl contacted Schmidt a week later, and he promised to look into the matter and call her back, but in fact did neither. Bohl finally sent a written request for full payment to HEI, with a copy to Pratt & Whitney, after which an attorney for HEI provided copies of the diverted checks to Bohl, and the remaining checks under both contracts were issued and mailed in accordance with the original instructions.[7]
 
 C.
 
 26
 On January 29, 1992, Louis and Susan Mancuso, Philip Hartman, Hartman Rack Products, and Robert Schmidt were charged in a 52-page, 23-count federal indictment. The indictment was divided into three sets of charges, one set for each contract from which proceeds had been diverted. Count 1 charged the Mancusos, Hartman, and HRP with conspiracy to commit an offense against or to defraud the United States, in violation of 18 U.S.C. Sec. 371. Count 2 charged the same group with bank fraud; while the second paragraph of the count broadly charged the parties with executing a scheme to defraud a financial institution "[b]eginning on or about August 28, 1990 and continuing thereafter to on or about February 11, 1991," the third and final paragraph of the count charged the parties, "for the purpose of executing said scheme" with knowingly and willfully diverting a particular check, issued on August 28, directly to the Mancusos. The next nine counts of the indictment each covered one of nine separate checks HRP diverted from FFSLAR to the Mancusos, as listed in footnote 4 above. Counts 12 and 13 charged Hartman and Mancuso, respectively, with making a false statement to a federally insured financial institution, in violation of 18 U.S.C. Sec. 1014.
 
 
 27
 The next set of counts dealt with the HEI Pratt & Whitney contract. Count 14 charged the Mancusos and Schmidt with conspiracy to defraud the United States; Count 15, structurally the same as Count 2 except that it involved a different set of characters, offered a broad charge of bank fraud and then a specific charge relating to the first check diverted to the Mancusos. The next three counts covered the remaining three diverted checks.
 
 
 28
 Finally, the last set of counts dealt with the Tropicana account. Count 19 charged the Mancusos and Schmidt with conspiracy to defraud the United States; Count 20 offered a broad charge of bank fraud and then a specific charge tied to the first diverted check, while the following two counts covered the remaining two diverted checks as set out in footnote 7. Count 23 charged Schmidt with making a false statement to a federally insured financial institution.
 
 
 29
 Defendants successfully moved to sever Counts 1-13, relating to the Hartman Rack Products contract, from the remaining counts relating to the HEI contracts. Defendants moved to dismiss all the bank fraud counts other than the first for each contract as multiplicitous. This motion was denied in a published opinion. United States v. Mancuso, 799 F.Supp. 567 (E.D.N.C.1992).
 
 
 30
 The two trials were held in July and August 1992, and all defendants were convicted on all charges. At sentencing for the Mancusos, the probation officer concluded that the base offense level, as a crime of fraud, was 6, and that this base should be enhanced by 11 levels based on an aggregate intended loss of $835,077.99. The court agreed that intended loss (rather than actual loss) was the proper enhancement guide, and sentenced Mancuso to 42 months imprisonment, and Susan Mancuso to 30 months imprisonment. Schmidt and Hartman each were sentenced under figures reflecting actual, rather than intended, loss, and received 5 months and 21 months imprisonment, respectively.
 
 
 31
 Each of the defendants now appeals, raising an aggregate of seven issues, five of which relate to the trial court's jury instructions, one of which is an appeal of the multiplicity issue, and one of which challenges the court's use of intended loss as the guide to determine the proper sentencing level. We address these issues in turn.
 
 II.
 
 32
 We first address each argument regarding the adequacy of the district court's jury instructions. We find no merit in the arguments and affirm as to each.[8]
 
 A.
 
 33
 The Mancusos requested an instruction requiring the jury, through a special interrogatory, to consider whether the government had proven beyond a reasonable doubt that FFSLAR had not breached its agreement to loan money to the Mancusos in August of 1990. Under the instruction, if the government had not so proven, the jury was required to find the defendants not guilty.
 
 
 34
 On appeal, the Mancusos, as well as the other defendants,[9] offer an extended analysis of North Carolina contract law, and argue that the convictions must be reversed because the judge failed to instruct the jury concerning the matter of the breach of the contracts between FFSLAR and the Mancusos. We review a judge's refusal to offer a specific instruction to the jury for abuse of discretion. United States v. Russell, 971 F.2d 1098, 1107 (4th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1013, 122 L.Ed.2d 161 (1993).
 
 
 35
 It is well to begin by stating the Mancusos' theory underlying this issue. They argue that FFSLAR breached the contracts through Robbins' statements to Mancuso in the August telephone conversation, and that
 
 
 36
 Precision's actions were undertaken in good faith to avoid financial ruin and prevent the disastrous consequences of FFSLAR's breach of contract. The payments Precision received from HRP and HEI were used to finance the completion of their construction projects and to repay the loans owed to FFSLAR.
 
 
 37
 Br. of Appellants, at 18. Before we address the relevance of these matters to the particular elements of the federal criminal laws at issue, it is necessary to detail the absolute failure of evidence that underlies this explanation of Mancuso's actions.
 
 
 38
 First, we examine the master line of credit agreement. Although Mancuso suggests that Robbins told him that there would be no further lending under that agreement, Robbins specifically denied this accusation at the second trial and came very close to denying it at the first trial. In addition, all of the relevant evidence, except for Mancuso's testimony, belies this story. By the end of September, Mancuso was informed by FFSLAR and Mr. Robbins that the line of credit had been extended another year. Only a week after he told Schmidt that the bank had "closed down" and that further payments were to be made to Precision directly, and before the first such payment was made, Mancuso entered into a contract with HEI for the Tropicana project, and soon thereafter applied for and was granted a $132,000 loan from FFSLAR. Another contract followed, with a $96,000 loan made on November 13. Of course, even if the 1989 line of credit had been breached, at the end of September 1990 the contract was renewed, and it is impossible to find that the new contract was breached when it was not in existence at the time of the "breach."
 
 
 39
 More importantly, even focusing only on the HRP contract, Mancuso's theory fails. Each draw-down under the line of credit constituted a separate contract, and for each one Mancuso signed a separate negotiable note and assignment of contract. Under this contract, FFSLAR had already fully performed by advancing the money in question. Thus, there was no anticipatory breach of contract. There is an absolute failure of evidence in this record to support the theory that there was a breach of contract, and the judge certainly did not abuse his discretion in not giving the proposed jury instruction. Lacking a factual predicate to make such a discussion on the merits anything more than an advisory opinion, we need not, and do not, address the Mancusos' theory that beach of contract can establish an absolute defense to the charges (under an impossibility theory).
 
 
 40
 Let it not be thought, however, that the district court rejected this issue outright in instructing the jury. Indeed, as the government points out, outside the impossibility defense, another way to examine this issue is within the matter of elements necessary to be proved to find that the defendants had in fact violated the laws charged. It is not a necessary element of any of the crimes charged, i.e., conspiracy to defraud the United States, making a false statement to a federally insured financial institution, or bank fraud, to find that a contract was not breached. One of the elements necessary under the bank fraud statute, however, is to show that "[t]he defendant knowingly executed or attempted to execute a scheme or artifice" to defraud. United States v. Bales, 813 F.2d 1289, 1293 n. 2 (4th Cir.1987). Thus, leveraged off the factual contention regarding Mancuso's understanding of the meaning of his conversation with Mr. Robbins during August, a relatively straightforward argument to the jury could be, and was, made that Mancuso lacked the mens rea necessary to support conviction under the bank fraud statute.
 
 
 41
 In this case, the district court gave this instruction:
 
 
 42
 Members of the jury, you have heard evidence from defendant Mancuso, that the bank changed its relationship with him and with the corporations he operated. Should you find as a fact that the bank ultimately changed its lending relationship with the defendant, such change would not in and of itself be a defense for the charges against the defendant. However, such evidence is relevant and pertinent when considering whether the bank's actions affected the defendant in such a way as to have a bearing on whether the defendant formed the criminal intent to defraud.
 
 
 43
 During his closing argument to the jury, Mancuso's lawyer addressed almost nothing but his theory that Mancuso lacked the element of intent necessary for conviction, based on his belief that the contract had been breached. In this instance, where a full instruction on mens rea was given that addressed in detail the particular lack of intent defense of the Mancusos, the trial court certainly did not abuse its discretion in refusing the defendants' instruction, and we affirm.[10]
 
 B.
 
 44
 Moving from one area of contract law to another, defendants now argue that the evidence introduced at trial failed to establish one of the elements of the bank fraud statute, and further that the trial court erred in refusing to instruct the jury on the provisions of the North Carolina version of the Uniform Commercial Code.
 
 
 45
 The bank fraud statute, 18 U.S.C. Sec. 1344, in effect at the time of these events provided in relevant part:
 
 
 46
 Whoever knowingly executes, or attempts to execute, a scheme or artifice--
 
 
 47
 (1) to defraud a financial institution; or
 
 
 48
 (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
 
 
 49
 shall be fined not more than $1,000,000 or imprisoned not more than 20 years, or both.
 
 
 50
 Defendants argue that because FFSLAR did not have any property interest in the diverted funds, one of the requisite elements to convict under this statute was not shown.
 
 
 51
 In McNally v. United States, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court analyzed the sister mail fraud statute and held that the "fraud" prohibited by the statute only reaches money or property interests, as opposed to intangible general social interests such as an interest in sound government. The Fourth Circuit adopted this approach to the "fraud" in the bank fraud statute in United States v. Orr, 932 F.2d 330, 332 (4th Cir.1991). Nevertheless, the scope of property interests protected is to be construed fairly widely. McNally, 483 U.S. at 356, 107 S.Ct. at 2879-80; Borre v. United States, 940 F.2d 215, 219 (7th Cir.1991).
 
 
 52
 Defendants argue that FFSLAR had no "property rights" in the money diverted. They indicate that the evidence "showed no more than a standard commercial arrangement creating well-recognized contractual rights," and that this does not evince the ownership, custody or control necessary under the statute. Of course, such an approach focuses only on the second subpart of the statute while ignoring the first subpart, which allows conviction for a defrauding of any property interest. The "commercial arrangements" under these facts include an assignment of rights, including an acknowledgement signed by the account debtor, and a security interest in the contract. It is impossible to accept defendants' assertion that the bank had no interest in the checks that HRP and HEI cut and sent directly to Precision. After the assignments of rights, Precision's interest in the proceeds of the contracts was extinguished, and FFSLAR held an interest in those funds. As a right that could be assigned, traded, bought, and otherwise disposed of, it is clear that the rights fall within the universe of property that will support the bank fraud convictions.
 
 
 53
 Second, the defendants argue that there was no fraud because Mancuso's actions were allowable under the provisions of the Uniform Commercial Code applicable to the area of modifications undertaken between assignors and account debtors to unperformed contracts. The provision in question requires a modification to be made in good faith and in a commercially reasonable manner.
 
 
 54
 Again, the claim on appeal seems to wander between an issue on the merits and an argument as to mens rea. On the merits, the answer is exactly the same as that addressed in section A above: the relevance is not precisely stated, and there is a complete failure of evidence to support such an argument. Mancuso's "panic," as he described it to the jury, and the subsequent diversion of funds, are completely mistimed. Whatever the subsequent consequences would have been from the inability to roll over the HRP loan, he still had $200,000 to repay on it before that issue became a reality. As for the HEI loans, there was no such justification of failure to obtain new funds to explain his actions. This issue is completely meritless.
 
 
 55
 As to the question of mens rea, defendants desired to argue this point to the jury to allow the jury to consider it "in judging the reasonableness, good faith, and intent of the defendants' acts." Appellants' Brief, at 28. But as the government points out, the district court gave detailed instructions on the mens rea necessary to convict under this statute, including a good faith instruction, and defense counsel argued this point as a mens rea question in closing to the jury. Under these circumstances, it certainly was not an abuse of discretion to refuse an instruction on modification of assigned contracts.
 
 C.
 
 56
 In order to convict Schmidt under the conspiracy and bank fraud charges, the Government had to prove that he acted "knowingly." Following its definition of "knowingly," the court gave an instruction on willful blindness:
 
 
 57
 The element of knowledge may also be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him. A finding beyond a reasonable doubt of a conscious purpose to avoid enlightenment would result in an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of a fact. Actual knowledge and deliberate or conscious avoidance of knowledge are the same thing.
 
 
 58
 Schmidt argues that it was reversible error to give this instruction. We review this matter for abuse of discretion. United States v. Whittington, 26 F.3d 456, 462 (4th Cir.1994).
 
 
 59
 "The willful blindness instruction allows the jury to impute the element of knowledge to the defendant if the evidence indicates that he purposely closed his eyes to avoid knowing what was taking place around him." United States v. Schnabel, 939 F.2d 197 (4th Cir.1991). "[W]hen there is evidence of both actual knowledge and deliberate ignorance, as in the case at bar, a willful blindness instruction is appropriate." Id. Courts often are wary of giving a willful blindness instruction, because of the danger they perceive in it allowing the jury to convict based on an ex post facto "he should have been more careful" theory or to convict on mere negligence ("the defendant should have known his conduct was illegal"). United States v. Sanchez-Robles, 927 F.2d 1070 (9th Cir.1991). Courts therefore restrict the use to cases not only where there is asserted lack of knowledge but also where there is evidence of deliberate ignorance. Id.
 
 
 60
 The evidence in this case supported the use of this instruction. The jury reasonably could have concluded that Schmidt deliberately avoided learning of the scheme to divert payments from FFSLAR. In September, despite receiving a fax from Mancuso that acknowledged that it was being sent under unusual circumstances, and despite having already signed a notice of assignment form and directed the accounts payable individuals to perform accordingly, Schmidt altered the flow of payments to Mancuso, allegedly because the bank had closed. Nevertheless, he had spoken with Bohl only days earlier; in the next few weeks he spoke with a coworker about an assignment form for the Tropicana contract; and spoke again with Bohl on several occasions later concerning the status of the payments. One of Schmidt's defenses was his lack of knowledge of what was going on. Under these facts, the judge did not abuse his discretion in instructing the jury that willful blindness as well as actual knowledge would support conviction.
 
 D.
 
 61
 Finally, each of the appellants argues that the district court erred in not giving a requested good faith instruction. Although the district court did give a variant on the good faith instruction, appellants preferred their own version. If the district court gives adequate instruction on specific intent, a separate instruction on good faith is not necessary. United States v. Fowler, 932 F.2d 306 (4th Cir.1991). The court's instructions on specific intent here were quite detailed. In addition, the court did give a variant on the good faith instruction, including the instruction that
 
 
 62
 [a] person who acts, or causes another person to act, on a belief or opinion honestly held is not punishable under the law merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong. An honest mistake or error in judgment does not rise to the level of knowledge, intent to defraud or willfulness required under the law.
 
 
 63
 The court did not use the words "good faith" or "complete defense." However, its instruction did adequately cover the question of the mens rea necessary to support conviction. Therefore, the court did not abuse its discretion in giving this version as opposed to another version of the good faith instruction.
 
 III.
 
 64
 Count 2 broadly charges bank fraud based on the HRP contract and relies upon the first diverted check, while each of Counts 3 through 11 rely on a separate check from HRP as the basis for its bank fraud charge. Count 15 is a bank fraud count based on the HEI Pratt & Whitney contract and also on the first diverted check, while Counts 16 through 18 are based on individual checks related to that contract. Count 20 is a bank fraud count based on the HEI Tropicana contract and also on the first diverted check under that contract, while Counts 21 and 22 are based on individual checks. Defendants argue that it is multiplicitous to have a separate charge for each check that was diverted rather than a single count for each contract.[11] The district court rejected this argument in its published opinion. Our review of this question is de novo.
 
 
 65
 The bank fraud statute, 18 U.S.C. Sec. 1344, punishes "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the money, funds ... or other property owned by, or under the custody or control of a financial institution." The dispute is over how we interpret the statute's language that prohibits action "executing a scheme." Put simply, did the Mancusos et al. execute a scheme to defraud only once for each contract, or did they execute a scheme to defraud every time a check was improperly sent to Precision?
 
 
 66
 The circuit law in this area has almost uniformly adopted the latter approach to this question, which allows a separate charge for each separate diversion of funds from the financial institution in question. In United States v. Poliak, 823 F.2d 371 (9th Cir.1987), cert. denied, 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988), the Ninth Circuit rejected Poliak's contention that each of the ten checks involved in his check-kiting scheme could not support a separate charge under Sec. 1344. It found each check to represent a separate execution of the scheme to defraud, and stated that the statute's language "plainly and unambiguously allows charging each execution of the scheme to defraud as a separate act." Id. at 372. Similarly, in United States v. Schwartz, 899 F.2d 243 (3d Cir.), cert. denied, 498 U.S. 901, 111 S.Ct. 259, 112 L.Ed.2d 217 (1990), the Third Circuit rejected Schwartz' claim that the three checks that he deposited with the bank could not support three separate charges because they were part of a single scheme to defraud. The court noted that "each deposit was a separate violation ... because in making each deposit Schwartz was executing his scheme to defraud Philadelphia National." Id. at 248.[12]
 
 
 67
 The Fifth Circuit reached a contrary result in United States v. Lemons, 941 F.2d 309 (5th Cir.1991), where it struck certain of the charges as multiplicitous; however, that case is factually quite different from the one considered here. In Lemons, Lemons, former head of the Vernon Savings & Loan, was prosecuted for bank fraud in connection with a multimillion dollar loan transaction. Out of the funds disbursed for the loan, Lemons personally received several payments, through a third party, from the real estate broker involved in the deal. Examining the facts of the case, the Fifth Circuit held that there was only a single scheme to defraud the bank involved in those circumstances, with several acts undertaken in furtherance of that scheme. Id. at 318.[13] See also United States v. Hord, 6 F.3d 276 (5th Cir.1993) (upholding convictions involving multiple charges, each for a separate fraudulent deposit, as not multiplicitous; distinguishing Lemons, cert. denied, --- U.S. ----, 114 S.Ct. 1551, 128 L.Ed.2d 200 (1994)).
 
 
 68
 We agree with the district court that, under the facts of this case, each separate check diverted from FFSLAR properly can be deemed a separate execution of a scheme to defraud the bank. In each instance, the checks were written in response to an invoice sent from the Mancusos to HRP or HEI, with the understanding and expectation that the payment would be made; and in each case, a payment that by all rights should have been made payable to FFSLAR and forwarded to it directly was diverted to the Mancusos, who deposited each check. Although each case presents a separate factual question that must be examined and handled individually, as the district court noted in its opinion, the diversion of a separately identifiable and discrete amount of money can, as here, be properly viewed as a separate execution of the defendants' scheme to defraud.[14]
 
 IV.
 
 69
 The defendants were sentenced under the provisions of the Sentencing Guidelines. The applicable provision is Sec. 2F1.1, "Fraud and Deceit." The calculation begins with a base level of 6, which is then increased based on the amount of loss involved. The probation officer who prepared the presentencing reports for the Mancusos calculated the loss as the intended, rather than actual, loss, which resulted in a figure of $835,077.99.[15] The probation officer reported that, based on the offense characteristics table under Sec. 2F1.1, this figure dictated an increase of 11 levels. Both Mancusos timely objected and now argue that the use of the intended loss figure is error, that the actual loss is the proper amount to consider, and that the figure must be reduced by the amount recovered or recoverable by the bank.[16]
 
 
 70
 As a preliminary matter, neither of the Fourth Circuit cases cited by the Mancusos directly addresses the fact pattern of the instant case. Defendants rely heavily on United States v. Baum, 974 F.2d 496 (4th Cir.1992), and United States v. Rothberg, 954 F.2d 217 (4th Cir.1992). Neither case applies directly to the question of the applicability of actual versus intended loss in these circumstances. Baum involved fraud in relation to an application to obtain a mortgage, where the Baums misstated material information in the application. The court specifically noted that " 'loss,' as the term is used in the guidelines, includes 'intended, probable, or otherwise expected loss.' " 974 F.2d at 499 (quoting United States v. Schneider, 930 F.2d 555, 558 (7th Cir.1991)). Because the court found that Baum did not intend the bank to lose money, it utilized the actual loss amount. And since Baum had given a security interest in the house, the court found that the loss amount (the loan) should be reduced by the amount of the security. Id. ("In our view, the potential consequences of default, rather than the amount of the loan, best measure the 'loss' to which Baum and Larson exposed the lender.").
 
 
 71
 In Rothberg, the district court similarly found that Rothberg, who had received a fully collateralized refinancing loan on his condominium through fraudulent means, had not intended for the bank to suffer any loss, so it did not apply the intended loss provision, and the panel found that this was not clearly erroneous. 954 F.2d at 218-19. Again, however, the court noted that in the general framework, the "commentary instructs the district court to use the greater of the actual loss suffered or the intended or probable loss the defendant attempted to inflict." Id. at 218. These two cases both indicate that, as a general rule, intended loss can be used as the baseline where the circumstances of the case warrant such an approach. Beyond that, since both cases involved either a finding from the district court that restricted the loss to actual loss or facts that justified such a limitation, they are quite fact specific and certainly do not establish any form of rule, as urged by the Mancusos, that actual loss is the per se appropriate yardstick. Fraudulent losses come about through an ever-expanding variety of means, and each case is examined on its own facts.
 
 
 72
 Having said that, however, we believe that the district court, for perfectly understandable reasons, misapplied the provisions of the Sentencing Guidelines. After referring to Sec. 2B1.1 for a general discussion of "loss," Application Note 7 to Sec. 2F1.1 states that "[c]onsistent with the provisions of Sec. 2X1.1 (Attempt, Solicitation, or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." In addition, Application Note 9 indicates that
 
 
 73
 [i]n the case of a partially completed offense (e.g., an offense involving a completed fraud that is part of a larger, attempted fraud), the offense level is to be determined in accordance with the provisions of Sec. 2X1.1 (Attempt, Solicitation, or Conspiracy) whether the conviction is for the substantive offense, the inchoate offense (attempt, solicitation, or conspiracy), or both.
 
 
 74
 Application Note 2 to Sec. 2B1.1, the general loss discussion, also references Sec. 2X1.1 in similar circumstances.
 
 
 75
 Application Note 4 to Sec. 2X1.1 indicates that in cases where there is a completed fraud included within an incomplete fraud, the offense level is calculated by taking the higher level of (1) the actual completed fraud or (2) the intended fraud minus 3 levels. It gives an example:
 
 
 76
 [W]here the intended offense was the theft of $800,000 but the participants completed (or were about to complete) only the acts necessary to steal $30,000, the offense level is the offense level for the theft of $800,000 minus 3 levels or the offense level for the theft of $30,000, whichever is greater.
 
 
 77
 The Application Note and illustration make clear that where the fraudulent activity was initiated but not completed, the proper approach in determining the offense level is to take the higher of the actual loss or the intended loss minus 3 levels.
 
 
 78
 Given that we find that each separate check supports a conviction for a separate execution of the scheme to defraud, it is clear that, at least under the instruction of Application Note 9, the provisions of Sec. 2X1.1 must be applied to this case. This is not a case of a completed fraud. While the amounts actually diverted to and received by the Mancusos on two of the three contracts were not equal to the total amounts of the contracts, the evidence seems clear that the only reason for this is that they were caught before they could divert all the money owed at the time the schemes were hatched. Thus, it is appropriate to treat this case as a smaller completed fraud within a larger uncompleted fraud, and thus apply the offense level for the greater of actual loss or intended loss minus 3. Because the court failed to apply this standard, we vacate the sentences of the Mancusos and remand their cases for resentencing.
 
 
 79
 An additional question raised by the parties relates to the calculation of actual loss. The Sentencing Guidelines provide very little guidance on this issue for transactions involving complex financing arrangements, such as assignments of rights and security interests. In Baum, noted above, the Fourth Circuit decided that Baum did not intend harm to the bank when he gave false statements as part of his mortgage application, and the court reduced the amount of loss by the security interest the bank had in the property. Here the facts are somewhat more complex. FFSLAR had been assigned the proceeds under the contract. This served as collateral for the loan. The bank also took a security interest in the contract. Unlike the fraudulent loan application case, however, the collateral was the very material spirited away by the fraud. The actual loss thus properly should be calculated simply as the amount of the diverted checks.
 
 
 80
 The Mancusos argue finally that the actual loss amount should be reduced by the amount of the collateral pledged to secure the master agreement. As noted initially, the collateral in the master agreement covers essentially everything owned by the Mancusos or their companies. But that collateral is tied to the outstanding loan of $800,000, not to the subsequent loans under the line of credit, which are selfcollateralized. Thus, the collateral pledged to secure the master workout agreement cannot be used to reduce the actual loss under the individual job loans involved here.
 
 V.
 
 81
 For the reasons stated above, we affirm the convictions of all defendants, as well as the sentences of Philip Hartman and Robert Schmidt. Finding error in the calculation of the sentences of Louis and Susan Mancuso, however, we vacate the sentences in 92-5819, 93-5011, 92-5832, and 93-5013, and remand these cases to the district court for resentencing.
 
 
 82
 CONVICTIONS AFFIRMED, SENTENCES AFFIRMED IN PART AND VACATED AND REMANDED IN PART.
 
 
 
 [1]
 In contrast, the master agreement stated that "[t]he amounts to be financed on all new job contracts will be determined by a detailed cost analysis furnished prior to approval so as to keep funding requirements as small as possible per contract." Unlike this fact- and labor-intensive approach to job financing, the testimony at trial indicated that, for whatever reason, a simple ceiling figure of 75% was utilized
 
 
 [2]
 At trial, Mancuso repeatedly referred to the "Office of Cook Security." On appeal, his lawyers assert that Mancuso was referring to the Office of Thrift Supervision
 
 
 [3]
 HRP apparently did send a check for $7,500 directly to FFSLAR two days after Hartman sent Bohl this false document. However, the following three checks, for a total of $70,640, were sent directly to Precision, made payable solely to Precision
 
 
 [4]
 A summary of the payments made is as follows:
 Date Recipient Amount ($)
 8/9/90 FFSLAR 52,920.00
 8/28/90 Precision 35,000.00
 Date Recipient Amount ($)
 9/4/90 Precision 30,000.00
 9/12/90 Precision 18,000.00
 9/18/90 Precision 25,000.00
 9/25/90 Precision 30,000.00
 10/3/90 Precision 13,000.00
 10/9/90 Precision 15,000.00
 10/17/90 FFSLAR 7,500.00
 12/17/90 Precision 11,000.00
 2/5/91 Precision 8,500.00
 Date Recipient Amount ($)
 2/7/91 Precision 51,140.00
 2/20/91 FFSLAR 102,577.92
 
 
 [5]
 By October, FFSLAR had renewed the Mancusos' loans and informed them of this fact. Of course, whatever the credibility of Mancuso's story before this date regarding his understanding of his relationship with FFSLAR, this act of borrowing $132,000 eliminates any plausibility it may have retained
 
 
 [6]
 For some reason that is not apparent, the payments under the Tropicana contract exceeded the contract amount
 
 
 [7]
 A summary of the payments made under the two HEI contracts prior to the end of March, 1991, is as follows:
 Date Recipient Amount ($)
 Pratt & Whitney Contract
9/11/90 FFSLAR 53,380.00
9/18/90 FFSLAR 24,650.00
Date Recipient Amount ($)
10/16/90 Precision 64,770.00
12/4/90 Precision 57,604.50
1/8/91 Precision 7,735.00
2/12/91 Precision 10,068.25
 Tropicana Contract
12/21/90 Precision 58,230.00
1/22/91 Precision 25,740.00
3/15/91 Precision 95,260.72
 
 
 [8]
 It is simply astonishing that, in an appeal having seven defense attorneys and one prosecutor involved, and alleging five separate reasons why the jury instructions given were improper, a full set of the court's instructions to the jury were not provided in the joint appendix. In fact, the main joint appendix does not even include a single page of the jury instructions, while the government's supplemental appendix contains ten pages from the jury instructions of two trials, when the jury instructions for just the first trial covered thirty one pages of the record. We can only wonder that the defense lawyers can assign error to the district court's instructions and not provide them to us for our review. See Fed.R.App.P. 30; IOP-30.1 (The appendix should contain "those parts of the record vital to the understanding of the basic issue on appeal.")
 
 
 [9]
 Hartman, HRP, and Schmidt all argue that this error applies to them as well. However, each failed to request such an instruction, and our review as to them is under the standard of plain error
 
 
 [10]
 The second issue in the Appellants' Brief relates to the harm that flowed to Hartman, HRP, and Schmidt from the failure to instruct on the breach of contract claim. Because we affirm as to the first issue, we affirm as to the second as well
 
 
 [11]
 " 'Multiplicity' is charging a single offense in more than one count in an indictment." United States v. Lemons, 941 F.2d 309, 317 (5th Cir.1991)
 
 
 [12]
 Accord United States v. Barnhart, 979 F.2d 647, 651 (8th Cir.1992)
 
 
 [13]
 See also United States v. Lilly, 983 F.2d 300, 302-05 (1st Cir.1992). In Lilly, the First Circuit struck numerous charges as multiplicitous of a single scheme to defraud a bank, where each count was supported by a separate fraudulent mortgage. The First Circuit insisted that it was not initiating or exacerbating a split in the circuits on this issue, reasoning, with citation to the Mancuso district court opinion, that "the range of decisions reflects the diversity of factors entering into an evaluation of multiplicity claims under the bank fraud statute--factors such as how many banks, how many transactions, and how many movements of money are involved." Id. at 305. In United States v. Brandon, 17 F.3d 409 (1st Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 80, 130 L.Ed.2d 34 (1994), the First Circuit then upheld a conviction involving twenty-five individual charges of bank fraud through a scheme involving fraudulent mortgage loan applications. The court distinguished Lilly and noted that "[e]ach time an identifiable sum of money is obtained by a specific fraudulent transaction, there is likely to be a separate execution of the scheme to defraud." Id. at 422
 
 
 [14]
 Of course, although the government in each case cited, as in this case, supports this expansive reading of the statute, we feel compelled to indicate that under this approach, each separate charge must be found by the jury beyond a reasonable doubt, a situation that may, in some circumstances, pose difficulty of proof for the government. In this case, there is no alternative sufficiency of the evidence appeal on any of the individual counts of the indictment, and we do not address that issue here; we merely indicate that this sword is two-edged
 
 
 [15]
 As indicated below, we vacate the Mancusos' sentences and remand for resentencing. We note in passing a discrepancy between the figures used by the probation officer and all the parties in every stage of this case, including the appeal, concerning the value of the HEI contracts. From the outset of the case, the government has posited the value of the HEI Pratt & Whitney contract to be $240,870, and the HEI Tropicana contract to be $176,000. Those are the numbers used in both the indictment as well as in the government's brief on appeal. (It is not clear to us as to the origin of the figures in the government's brief on appeal, since the government, ignoring Fed.R.App.P. 28(a)(4), (e), does not indicate the authority for any of its factual allegations.)
 In the presentence reports for the Mancusos, substantially higher figures, $254,938.25 and $267,164.74, respectively, are offered. The derivation of these figures is not apparent to us, and we believe that this matter should be taken up as part of the resentencing, given that it substantially affects the intended loss figure that is used as a jumping-off point for calculation of the actual sentences.
 
 
 [16]
 Both Hartman and Schmidt were sentenced using the actual amounts of the loan checks diverted, rather than the intended loss figure, i.e., the aggregate amounts of the loans less the amounts initially paid to the bank. While they join in the argument regarding the issue of collateralization and the amount of the actual loss, because we affirm on these issues we also affirm the sentences of each of them as well