**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.                                                                          No. 98-4633

ANDREW R. ADLER,
Defendant-Appellee.

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Joseph F. Anderson, Jr., District Judge.
(CR-98-106-JFA)

Argued: May 7, 1999

Decided: August 2, 1999

Before MURNAGHAN and LUTTIG, Circuit Judges,
and WILLIAMS, Senior United States District Judge
for the Eastern District of Virginia,
sitting by designation.

_____

Affirmed by published opinion. Judge Luttig wrote the opinion, in
which Senior Judge Williams joined. Judge Murnaghan wrote a sepa-
rate concurring opinion.

_____

**COUNSEL**

**ARGUED:** Dean Arthur Eichelberger, Assistant United States Attor-
ney, Columbia, South Carolina, for Appellant. Parks Nolan Small,
Federal Public Defender, Columbia, South Carolina, for Appellee.

**ON BRIEF:** J. Rene Josey, United States Attorney, Columbia, South Carolina, for Appellant.

_____

**OPINION**

LUTTIG, Circuit Judge:

The United States appeals from the district court's entry of a judgment of acquittal following defendant Andrew R. Adler's conviction for federal wire fraud against Printgear, Inc., a supplier for Adler's former company. Because, insofar as is relevant in this case, deprivation of a property right is the sine qua non of a wire fraud offense and Adler did not deprive Printgear of anything in which Printgear had a property right, we affirm.

I.

Defendant Adler was co-owner with Jeffrey N. Kennedy of Adler Industries, a Georgia corporation that was in the business of custom-printing t-shirts. In 1996, Adler Industries contracted with the House of Blues, an Atlanta restaurant, to provide the restaurant with over 400,000 t-shirts emblazoned with the House of Blues logo for sale during the summer Olympic Games. Adler Industries then contracted with Printgear, a South Carolina corporation with which it had previously done business, for the necessary blank t-shirts. Printgear agreed to provide the shirts on credit, with payment due August 15, 1996, about two weeks after the Olympics were to end. Although the credit was unsecured, Printgear obtained personal guarantees from Messrs. Adler and Kennedy.

The Olympic bombing thwarted the House of Blues' plans to sell a large volume of t-shirts, however, as it led the police to rope off the section of Atlanta where House of Blues was located. Because of this and other problems, House of Blues found itself forced to cut its promised orders from Adler by over half. Adler Industries and House of Blues ultimately settled Adler's claim for breach of contract, with Adler receiving $831,750 from House of Blues on August 26. At the time Adler Industries received this payment, it was insolvent, due to

2

a $454,657.74 debt to Printgear and debts to several other unsecured creditors. After paying some of these unsecured creditors (but not Printgear), Adler Industries had $530,000 remaining in the bank. Messrs. Adler and Kennedy concluded that if they paid Printgear, they would have no money left either for themselves or to run the business. So, on August 27, they caused Adler Industries to pay each of them a "bonus" of $265,000. Two days later, they left the country, ultimately depositing the funds in Costa Rica.

Beginning on August 15, which was both the due date on Adler Industries' debt to Printgear and about the date when Printgear learned of House of Blues' breach, Alvin Strasburger, one of Printgear's owners, began regularly contacting Adler Industries with demands for payment and threats of legal action. Adler originally claimed that it would pay Printgear as soon as it received the House of Blues settlement, but, as noted, no such payment to Printgear occurred. At a September 16 meeting in Atlanta arranged by Messrs. Adler and Kennedy after they had returned to the United States, they informed Strasburger and Mary Minus, another owner of Printgear, that Adler Industries had paid other creditors with the House of Blues settlement money. Adler and Kennedy added, however-- falsely -- that Adler Industries was still in business and doing well, and they promised that future earnings would enable it to pay Printgear.

During this meeting, Strasburger demanded that Mr. Adler account for his company's spending of the House of Blues settlement money. The next day, September 17, Mr. Adler sent Printgear by facsimile an intentionally false list of payments from the settlement. Among other things, the list did not disclose the payments to Adler and Kennedy. Eventually, when Adler Industries failed to pay Printgear, Printgear sued the company, Mr. Adler, and Mr. Kennedy in Georgia, obtaining default judgments for the full amount due under the contract.

A grand jury thereafter indicted Adler and Kennedy on one count of inducing interstate travel in furtherance of a fraudulent scheme, in violation of 18 U.S.C. § 2314, and one count of wire fraud, in violation of 18 U.S.C. § 1343. The wire fraud count alleged that the September 17 facsimile was in furtherance of a scheme to defraud Printgear. Kennedy pleaded guilty to count one (section 2314) and agreed to testify against Adler in exchange for having count two

3

against himself dismissed. With regard to Adler, the district court dismissed count one, and then, following a trial and conviction on count two, granted Adler's motion, pursuant to Fed. R. Crim. P. 29(c), for a judgment of acquittal on that count. The government now appeals the grant of this motion.

II.

The resolution of this case turns on whether defendant Adler deprived Printgear of any property in which it held an interest as a matter of right, for, as relevant here, the sine qua non of a conviction under the federal wire fraud statute is the deprivation of another's money or property through fraudulent means. On the facts of this case, there are only two kinds of property of which Printgear could have been deprived --- its chose in action on Adler Industries' debt or the particular money itself that Adler Industries received from the House of Blues settlement. Although Printgear clearly had a property interest in the chose in action, it was not deprived of that property; in fact, Printgear exercised its right to sue on that interest and secured a default judgment in a court of law. The only issue before us, therefore, is whether Printgear possessed a property right in the particular settlement proceeds received from House of Blues.

The federal wire fraud statute provides criminal sanctions for anyone who,

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate . . . commerce, any writings . .. for the purpose of executing such scheme or artifice . . . .

18 U.S.C. § 1343. With one exception not relevant here, this statute, and the parallel mail fraud statute,[1] 18 U.S.C. § 1341, are limited to "protecting property rights," McNally v. United States, 483 U.S. 350,

_____

[1] See Carpenter v. United States, 484 U.S. 19, 25 n.6 (1987) ("The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here.").

4

357 (1987), and thus reach (and only reach) "any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises," Carpenter v. United States, 484 U.S. 19, 27 (1987).**2** The Supreme Court has admonished that these statutes should "be interpreted broadly insofar as property rights are concerned." McNally, 483 U.S. at 356. It has thus held that the "property" of which a victim is deprived need not be tangible property, Carpenter, 484 U.S. at 25, and that the victim of fraud need not suffer financial loss; rather, he need only be deprived of some right over that property, such as the right to exclusive use, id . at 26-27. See McNally, 483 U.S. at 359. In the context of the bank fraud statute, 18 U.S.C. § 1344, which is for purposes here analogous to the mail and wire fraud statutes, we have applied the common sense notion that property is anything in which one has a "right that could be assigned, traded, bought, and otherwise disposed of." United States v. Mancuso, 42 F.3d 836, 845 (4th Cir. 1994).**3**

Here, as noted, the only property of which Printgear was arguably defrauded is the settlement money that Adler Industries received from House of Blues. Although all property rights are, like any other legal right, intangible, the underlying property in this case -- the money -- is not. See United States v. Granberry , 908 F.2d 278, 280 (8th Cir. 1990) ("Money is money, and `money' is specifically mentioned in the statutory words."). Thus the question is not, as it was in Carpenter, whether one can, for purposes of section 1343, have a protected property right in the object of the charged fraudulent scheme. Here the object is the settlement money, and no one disputes that

_____

**2** The exception is 18 U.S.C. § 1346, which provides that "the term `scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." Section 1346, enacted in 1988, superseded the holding in McNally that section 1341 did not reach "schemes to defraud citizens of their intangible rights to honest and impartial government," McNally, 483 U.S. at 355. As the government has acknowledged throughout, this is not an "honest services" case.
**3** In both Mancuso, 42 F.3dat 845, and United States v. Orr, 932 F.2d 330, 332 (4th Cir. 1991), we treated section 1344 as analogous to section 1341 and 1343 for purposes of determining whether the defendant had deprived his victim of something that constituted property of the victim.

5

ownership of money is protected under section 1343; the sole question is whether Printgear had any property right in that money.**4**

The government offers three arguments for why Printgear did have a property right in the money that Adler Industries received from House of Blues. The first argument, based on an alleged agreement between Adler Industries and Printgear, and the second, based on Georgia law, are arguments that Printgear actually had an ownership interest in the money. The third argument, which is less clear, appears to be that, because of Printgear's separate property right in the chose in action on Adler Industries' debt, Printgear, even though unsecured, also had some sort of property right in the settlement money as a source of payment for that debt. We address these arguments in turn, and find none persuasive.**5**

_____

**4** This distinction between the property and a right to that property also renders irrelevant the government's argument that Mr. Adler, by diverting the funds, violated section 1343 because those funds were "something of value," McNally, 483 U.S. at 358 (quoting Hammerschmidt v. United States, 265 U.S. 182, 188 (1924)), to Printgear. The question whether something is a "thing of value" and thus protected under the wire fraud statute from being fraudulently obtained is distinct from the question of who has a property right to that "thing." See United States v. Hickok, 77 F.3d 992, 1003 (7th Cir. 1996) (explaining that defendant "used a variety of devices to obtain `things of value' that properly belonged to" the victim) (emphasis added)). There is no dispute in this case over whether money is a "thing of value"; the question is whether that thing "properly belonged to" Printgear. Thus, whatever the scope of the term "thing of value," see generally McNally, 483 U.S. at 358 n.8; United States v. Loney, 959 F.2d 1332, 1335-36 (5th Cir. 1992), it has no special bearing in this case.
**5** Although the government states the general issue as "whether the proceeds of the House of Blues settlement represented `something of value' to Printgear," Appellant's Br. at 14, and, as we explain, makes three arguments that Printgear did have a property right in that settlement, the final argument of these three may include (or actually be) the claim that Mr. Adler deprived Printgear not of its right to the settlement money per se, but rather, by diverting that money, deprived Printgear of its separate property right in the chose in action for payment of Adler Industries' debt to Printgear. Compare id. at 16 ("Printgear had an independent interest in the funds as the object of a collection suit."), with id. at 17

6

First, the government, although admitting that Printgear was an unsecured creditor, nevertheless argues that Printgear acquired a property right in the House of Blues settlement money because defendant Adler orally promised Printgear that Adler Industries would pay Printgear out of that money. Assuming <u>arguendo</u> that such an agreement by an insolvent corporation to allocate certain funds to a single unsecured creditor would be valid under the bankruptcy laws and, if valid, could suffice to create a property right for that creditor in those funds for purposes of section 1343, <u>see Miller</u> v. <u>United States</u>, 997 F.2d 1010, 1017 (2d Cir. 1993) ("[A] contract right can constitute § 1341 property."), we reject the government's argument because there was no such agreement.

Mr. Adler did undoubtedly tell Printgear that Adler Industries would be able to pay Printgear after it received the settlement from House of Blues. But such a claim by Mr. Adler is a far cry from a promise to Printgear of that particular money, and the record reveals that no such promise was ever made. An employee of Printgear testified that during a telephone conversation with Mr. Adler, Adler told him "[t]hat as soon as The House of Blues paid him, then he would be able to pay us our money."[6] Similarly, Strasburger testified merely

_____

("The deliberate destruction of the value of <u>the account receivable</u> . . . should be prosecutable under the wire fraud statute.") (emphases added). To the extent that this is the government's argument, we reject it also, because Mr. Adler did not deprive Printgear of its chose in action. As we have explained, Printgear did avail itself of this legal right, suing not only Adler Industries but also Messrs. Adler and Kennedy, who had personally guaranteed the debt, on that right.

That Printgear retained its right in the chose in action distinguishes this case from <u>United States</u> v. <u>Ely</u>, 142 F.3d 1113 (9th Cir. 1998), on which the government heavily relies. In <u>Ely</u>, a bank fraud case, the parties (according to the indictment) changed their legal arrangement in such a manner that the victim of the fraud was actually deprived of its original right to demand payment on a debt. Not surprisingly, therefore, the court in <u>Ely</u> reinstated an indictment alleging that a debtor violated section 1344 by fraudulently convincing a bank not to demand payment of interest due but instead to provide the debtor further credit to enable it to pay that interest. <u>Id</u>. at 1119.

[6] Even if this conversation did amount to a promise by Mr. Adler to allocate these funds to Printgear, we would not hold it to create a contract

7

that Mr. Adler told him "that as soon as he collected we would be paid." As Strasburger acknowledged, Adler Industries had simply given Printgear "a contract to pay" -- one that Printgear could, and did, convert into "a judgment" against Adler Industries when it breached that contract. But a creditor-debtor contract, such as the one here, is not (at least is not necessarily) a contract that the debt will be paid out of any particular monies.

The government next argues that, under the Georgia law that governed Adler Industries and its officers, Adler Industries' directors (including Mr. Adler) had a fiduciary duty, once the company became insolvent, "to manage the remaining assets for the benefits of its creditors." Hickman v. Hyzer, 401 S.E.2d 738, 740 (Ga. 1991) (internal quotation marks omitted) (quoting Ware v. Rankin, 104 S.E.2d 555 (Ga. Ct. App. 1958)). This duty, the government contends, created for those creditors a property right in the company's remaining assets and thus created a property right for Printgear, as one of numerous unsecured creditors of Adler Industries, in the assets that Adler Industries received from House of Blues.

Although the government correctly states the duty that Hickman imposes on directors of insolvent corporations, it does not follow from the existence of this duty that the creditors have a property right in the corporation's assets. Rather, as the court in Hickman itself clearly explained, a violation of the duty merely creates a right "to an action against the directors to recover sums improperly paid out by the corporation." Id. That is, it creates a right to sue the directors personally, not a right to any particular funds. Further, the liability of the directors is to the corporation, not to the corporation's creditors (even though the purpose of the liability is to enable the corporation to pay its creditors), as reflected in the statute on which Hickman, 401 S.E.2d at 740, relied. See Ga. St. § 14-2-832(a) (making director who "votes for or assents to" an unlawful distribution from the corporation to a shareholder "personally liable to the corporation for the amount

_____

for such an allocation, because there is no indication that this employee with whom Adler spoke, who was not an officer of Printgear, had authority to make contracts for Printgear, or that Adler thought she did. The record actually shows that she lacked such authority. J.A. at 423-24.

8

of the distribution"). This statute is fully consistent with the fact that the corporation's money is its own, and neither Hickman nor the statute offers us any reason to believe that the mere existence of a fiduciary duty upon a corporation's directors creates a property right in the corporate assets for that corporation's unsecured creditors, much less that the directors' duty could create a property right for a particular creditor in particular assets.**7**

The government's third argument is that a property right in the settlement money arose because Mr. Adler, by diverting these funds, "prevent[ed] collection of lawful debts." The actual argument for a property right, although not entirely clear, appears to be that Printgear's admitted property right in the chose in action on the unsecured debt created an additional property right in any funds needed to satisfy that debt. We reject this argument because it blurs the distinction between two distinct types of property, one of which (a right to sue for payment of a debt) an unsecured creditor undoubtedly does own, and the other of which (the debtor's money) the unsecured creditor, equally undoubtedly, does not own.

We made clear in Mancuso that a claim on a debt is distinct from a claim to particular funds to satisfy that debt and that the mere existence of the former does not give rise to the latter. In that case, the defendant had agreed with a bank, as a condition for receiving a loan for his company, that in all future work contracts obtained by his company with financing from the bank, the bank's loan would be "secured by a lien on the particular job contract for which financing was provided." 42 F.3d at 839. In addition, the defendant agreed that all checks due on those work contracts would be jointly payable to the bank and the defendant's company and would be mailed directly to

---

**7** To the extent that the government is claiming that the mere breach by Mr. Adler of a fiduciary duty to which he was subject as a director of Adler Industries could amount to a violation of the wire fraud statute, the government is attempting to rely on 18 U.S.C. § 1346, which it may not do for the first time on appeal. We take no position on whether that section allows a conviction of a defendant who was not a governmental official. See generally United States v. Frost, 125 F.3d 346, 365-66 (6th Cir. 1997) (discussing scope of section 1346), cert . denied, 119 S. Ct. 40 (1998).

the bank. Id. The defendant thereupon told his customers to make the checks out to his company only and to mail them directly to him. On appeal, he argued that the bank "did not have any property interest in the diverted funds," because the bank's arrangement with his company was "no more than a standard commercial arrangement." Id. at 845. We rejected this argument, finding it "impossible to accept defendants' assertion that the bank had no interest in the checks that HRP and HEI cut and sent directly to Precision. After the assignments of rights, Precision's interest in the proceeds of the contracts was extinguished, and FFSLAR held an interest in those funds." Id. (emphasis added). In other words, the bank had a property right to particular funds to satisfy a debt because it had explicitly contracted for that right.

The relationship between Printgear and Adler Industries stands in marked contrast to that between the bank and the defendant's company in Mancuso. Unlike in Mancuso, Printgear did nothing to secure payment from particular funds and did nothing at all to ensure payment other than to obtain personal guarantees from Adler and Kennedy, as the following colloquy at trial between Minus and defense counsel highlights:

> Q: Now, did you have any discussions with your partners about other ways [besides the personal guarantees] you could secure payment to Printgear of Printgear's payment?
>
> A: No.
>
> Q: Okay. You didn't talk to The House of Blues about getting Printgear's name put on the check?
>
> A: No.
>
> Q: That would have been a very logical way to kind of guarantee payment, wouldn't it?
>
> A: I didn't think I needed it.

J.A. at 45. Printgear lacks the very thing that provided the bank in Mancuso a property right in the proceeds from the contracts of the

10

defendant's company with its customers -- a contractual right to the particular monies in question.

Thus, even though Adler and Kennedy, by diverting substantial sums of that settlement to themselves, undoubtedly made it harder for Printgear to obtain payment following a judgment on the chose in action, they did not deprive Printgear of anything that Printgear actually owned, because Printgear did not have a property right in the particular settlement proceeds from House of Blues. See United States v. Carman, 577 F.2d 556, 564-65 (9th Cir. 1978) ("[M]oney placed out of the reach of creditors is not the equivalent of money `stolen, converted or taken by fraud' within the meaning of" 18 U.S.C. § 2314, because creditors are not the owners of this money.).**8** Printgear could have "assigned, traded, bought, and otherwise disposed of," Mancuso, 42 F.3d at 845, its chose in action on Adler Industries' debt, but it had no such right to do the same with the House of Blues settlement money. The former was Printgear's property; the latter was not.

Accordingly, we conclude that Mr. Adler did not deprive Printgear of anything in which it had a property right and thus that, however unsavory his conduct and whatever other laws he may have violated, he did not violate section 1343. This conclusion, we suspect, will hardly come as a surprise to the government. As government counsel candidly acknowledged at argument, the facts of this case placed it, at best, on the very "periphery" of the federal wire fraud statute.

The judgment of acquittal is hereby affirmed.

AFFIRMED

_____

**8** We relied heavily on Carman , whose facts are essentially identical to those in this case, in United States v. Burbank, 848 F.2d 453, 456 (4th Cir. 1988). The government's effort to distinguish these two cases on the ground that they involved tangible property is unpersuasive because it ignores the distinction, discussed above, between the nature of the property and of the right in that property. The property in this case, money, is tangible and is the same sort of property at issue in Carman and Burbank. The question is, just as it was in Carman, whether the creditor has "the attributes of an owner" of the money, 577 F.2d at 565.

11

MURNAGHAN, Circuit Judge, concurring:

I concur. I write only to emphasize that Adler and Kennedy have not escaped the arms of the law. While Printgear's failure to obtain a security interest in the funds paid to Adler Industries by the House of Blues precludes criminal liability here, Printgear is now a judgment creditor and may well receive payment from Adler Industries. The majority's holding thus returns cases like the instant case to where they belong: the civil and bankruptcy arenas where the assets of unsavory businessmen can be divided to satisfy debts owed to trusting creditors like Printgear.

12