**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

  v.

JOSEPHINE VIRGINIA GRAY, a/k/a
Josephine Stribbling, a/k/a
Josephine Mills,

    *Defendant-Appellant.*

No. 02-4990

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CR-01-566)

Argued: February 4, 2005

Decided: April 29, 2005

Before WIDENER and SHEDD, Circuit Judges, and
James C. CACHERIS, Senior United States District Judge
for the Eastern District of Virginia, sitting by designation.

---

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Shedd wrote the opinion, in which Judge Widener and Judge
Cacheris joined.

---

## COUNSEL

**ARGUED:** Denise Charlotte Barrett, Assistant Federal Public
Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Bal-

timore, Maryland, for Appellant. Sandra Wilkinson, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Baltimore, Maryland, for Appellant. Thomas M. DiBiagio, United States Attorney, James M. Trusty, Assistant United States Attorney, Greenbelt, Maryland, for Appellee.

---

## OPINION

SHEDD, Circuit Judge:

A grand jury indicted Josephine Gray on five counts of mail fraud and three counts of wire fraud relating to her receipt of insurance proceeds following the deaths of her second husband and a former paramour. Gray was convicted on all counts, and the district court sentenced her to 40 years' imprisonment, three years of supervised release, restitution in the amount of $170,000, and a special assessment of $800. Gray now challenges her conviction, arguing that the evidence was insufficient to prove the elements of the charged offenses; the district court improperly permitted the Government to reopen its case to prove the alleged mailings; and the district court improperly admitted "other crimes" and hearsay evidence against Gray. We find no reversible error on these grounds and affirm Gray's conviction. We vacate Gray's sentence, however, and remand this case for resentencing consistent with the Supreme Court's recent decision in *United States v. Booker*, 125 S. Ct. 738 (2005).

### I.

Wilma Jean Wilson met Gray in the late summer of 2000, and the two became friends.[1] They spoke over the telephone, and Wilson sometimes visited Gray's house. During one of those visits, Gray was busy cleaning a cluttered room and Wilson offered to help. As they

---

[1]Because Gray challenges the sufficiency of the evidence to support her conviction, we view the evidence adduced at trial in the light most favorable to the Government. *See United States v. Glasser*, 315 U.S. 60, 80 (1942).

were talking, Gray stopped cleaning and left the room briefly; when she returned, she brought newspaper articles describing her prior arrests. In fact, those articles reported that Gray had killed her former husbands. Wilson asked if the reports were true, and Gray replied that she was going to tell Wilson something she had never told anyone before and she did not want Wilson to say anything about it. In an emotionless, matter-of-fact manner, Gray then told Wilson that "she had killed both her husbands and another gentleman." J.A. 144.

Gray told Wilson that she had killed her first husband, Norman Stribbling, because she was tired of being abused by him. According to Wilson, "[s]he told me that they had gone out for a ride and that she had shot him. . . . [S]he left the body over on River Road, and it was set up to look like it was a robbery." J.A. 145. Gray then confessed to Wilson that she had also killed her second husband, William "Robert" Gray. Although Gray said she was alone with Stribbling when she killed him, "she had help" killing Robert Gray. J.A. 146. The help came from Clarence Goode, Gray's cousin and boyfriend. Gray explained to Wilson that Goode "had tried to blackmail her," demanding money in exchange for his silence about the murder of Robert Gray, so "she had to get rid of him too." J.A. 147.

## A.

Gray's first husband, Stribbling, maintained a life insurance policy through John Hancock Mutual Life Insurance Company and named Gray as the beneficiary. In the early morning of March 3, 1974, Stribbling was found dead in his parked car on River Road, near his home in Montgomery County, Maryland. An autopsy revealed that Stribbling died from a single gunshot wound to the head. Shortly after Stribbling's death, Gray made a claim for insurance benefits and later received a check in the amount of $16,000.

## B.

Gray had been having an affair with Robert Gray while she was still married to Stribbling. In August 1975, the couple bought a house in Gaithersburg, Maryland — using most of the proceeds from Stribbling's insurance policy as a down payment — and three months later they married. Robert Gray maintained an insurance policy through

Minnesota Mutual Life Insurance Company ("Minnesota Mutual") that provided for payment of the mortgage on the Grays' house in Gaithersburg in the event of his death, with any excess going to his spouse. Robert Gray also maintained an accidental death insurance policy through Life Insurance Company of North America ("LINA") and designated Gray as his beneficiary.

Robert Gray left the Gaithersburg house in August 1990, telling family members that his wife was trying to kill him and that she was having an affair with Goode, who had been living with the Grays. So convinced was Robert Gray that his wife intended him harm that he removed her as his beneficiary under two other insurance policies. He asked relatives and friends for help in avoiding a possible assault by Gray or Goode.

In late August 1990, Robert Gray brought criminal charges against Gray, alleging that Gray had assaulted him at his workplace by swinging at him with a club and lunging at him with a knife. Robert Gray also brought charges against Goode, alleging that Goode had threatened him with a 9-millimeter handgun. Robert Gray appeared in court on October 5, 1990, but the case against Gray and Goode was continued. Later that same day, Robert Gray was driving home when he noticed his wife's car behind him. She was flashing her lights and signaling her husband to pull over. When Robert Gray did not pull over, Gray drove her car alongside her husband's car. As Robert Gray turned to look toward his wife, Goode sat up (from a reclined position) in the front passenger seat and pointed a gun at him. Robert Gray reported this incident to police, and a warrant was issued for the arrests of Gray and Goode. One week before the November 16, 1990 trial date, Robert Gray was discovered dead in his new apartment, shot once in the chest and once in the neck with a .45 caliber handgun.

Gray told police investigators that she was not involved in her husband's death and that she did not own a .45 caliber handgun. Other witnesses testified, however, that they had seen Gray in possession of a .45 caliber handgun, and police investigators retrieved a .45 caliber bullet from her purse. Gray also offered an alibi that other witnesses at trial discredited.

As a result of Robert Gray's death, Minnesota Mutual paid approximately $51,625 to Perpetual Savings Bank — the named beneficiary — to cover the mortgage on the Gaithersburg house. Once the mortgage was satisfied, Gray sold the house for a significant profit. The total benefit under Robert Gray's policy exceeded the mortgage payoff amount, so Minnesota Mutual expected to pay the excess benefit to Robert Gray's spouse. Because Gray's whereabouts were unknown to Minnesota Mutual, that benefit was not processed for about ten years.

In 2001, federal law enforcement officers provided Minnesota Mutual a current address for Gray, and the company mailed Gray a form letter notifying her of the availability of the excess benefit and enclosing an application. Having received this information, Gray telephoned Minnesota Mutual and asked whether the policy had a double indemnity benefit if Robert Gray's death was accidental; it did not. Gray then completed the claim application and mailed it to Minnesota Mutual. The next week, Gray telephoned Minnesota Mutual to monitor the status of her claim. Minnesota Mutual eventually mailed Gray a check for more than $2,400.

Gray made a claim for benefits under the LINA policy in May 1991. LINA did not initially pay any benefit because it knew that Gray was a suspect in Robert Gray's murder. After learning that Gray had been indicted, LINA asked Gray to disclaim her interest in the benefits under its policy. She refused, so LINA filed an interpleader action to determine the proper beneficiary under Robert Gray's policy and Maryland law. Gray counterclaimed against LINA, seeking the full benefit under the policy plus attorneys' fees. LINA bore the costs of this litigation, which far exceeded the value of the policy. LINA ultimately paid Gray $2,000 when the other beneficiaries abandoned their claims to the benefits.

Consistent with Maryland law, both Minnesota Mutual and LINA refused to pay benefits to named beneficiaries who wrongfully caused the death of the insured. Both Minnesota Mutual and LINA relied upon local law enforcement investigators to determine whether Gray was involved in Robert Gray's death.

C.

Gray told Wilson that she "had to get rid of" Goode because he was blackmailing her. Goode had conspired with Gray in Robert Gray's murder, and he was demanding "part of the insurance money that she received" from Robert Gray's death in return for his silence. J.A. 147. On June 21, 1996, Baltimore City Police officers found Goode's body in the trunk of his car; he had been shot in the back with a 9-millimeter handgun. Goode had told his sister that he was going to visit Gray at her house, where police later found 9-millimeter bullets and a large blood stain on the floor of the garage.

Goode maintained a life insurance policy through Interstate Assurance Company ("Interstate Assurance") and named Gray as his beneficiary under the policy. Shortly after an incident in which Gray pointed a knife at him, Goode closed the bank account from which the premiums for this policy were paid. Interstate Assurance advised Goode by letter in June 1996 that he had a 60-day grace period before the policy would be cancelled for non-payment. Goode's mail was sent to Gray's address, however, and Gray killed Goode shortly after learning that the policy might be cancelled. Gray filed a claim for benefits in September 1996, but Interstate Assurance refused to pay because it suspected that Gray was involved in Goode's death. When Gray had not been arrested after two years, Interstate Assurance filed an interpleader action to determine the proper beneficiary under Goode's policy. In the course of that litigation, Gray filed pleadings, by mail, in which she flatly denied any involvement in Goode's death. Because Gray's guilt could not be proved at that time, the parties settled the interpleader action and Interstate Assurance paid Gray $99,990 in benefits under Goode's policy.

D.

Shortly after Goode's murder, Gray showed her new boyfriend, Andre Savoy, a copy of Goode's insurance policy and told him that she planned to buy him a new Mustang GT with the proceeds. Gray never bought Savoy that car, but she did make inquiries about obtaining life insurance on him. According to Wilson, Gray asked her for help in obtaining insurance on Savoy through a Virginia company. When federal agents contacted Wilson in February 2002, she immedi-

ately asked about Savoy. She thought Gray might have tried to kill him too.

### E.

Counts One through Four of the indictment charged Gray with executing a scheme to defraud Minnesota Mutual and LINA of life insurance benefits they paid Gray as a result of Robert Gray's death. Counts Five through Eight charged Gray with executing a scheme to defraud Interstate Assurance of the benefits it paid Gray as the result of Goode's death. The indictment alleged that Gray "intentionally caused the death[s]" of both Robert Gray and Goode and then fraudulently concealed her role in their murders from the insurance companies. As she submitted claims for benefits and telephoned the insurance companies to monitor her claims, and in papers filed in legal proceedings concerning the insurance policies, Gray consistently denied having any involvement in the murders.

### II.

Gray challenges her conviction on several grounds. First, she argues that the evidence was insufficient to support a conviction on all counts of the indictment because the insurance companies — the victims identified in the indictment — had no interest in the benefits paid under the policies. Second, Gray argues that the evidence was insufficient to support a conviction on Counts One through Four because it did not prove that she intended to defraud Minnesota Mutual by her conduct. Third, Gray challenges the district court's denial of her motion for judgment of acquittal on Counts Seven and Eight because the Government failed to prove the alleged mailings in its case-in-chief. Finally, Gray argues that she is entitled to a new trial because the district court erroneously admitted into evidence "other crimes" evidence related to the Stribbling murder and hearsay testimony from Robert Gray.

### A.

Gray first contends that her convictions on all counts of the indictment should be vacated because the evidence failed to establish that

the insurance companies had any property interest in the benefits paid under the relevant insurance policies. Gray's conviction must be upheld if "there is substantial evidence, taking the view most favorable to the Government," to support it. *Glasser*, 315 U.S. at 80. "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (*en banc*).

Both the mail fraud and wire fraud statutes criminalize "devis[ing] or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343. It is essential to a conviction under these statutes that the victim of the alleged fraud actually have an interest in the money or property obtained by the defendant. *United States v. Adler*, 186 F.3d 574, 576 (4th Cir. 1999). Gray contends that although she obtained more than $150,000 in insurance proceeds from Minnesota Mutual, LINA, and Interstate Assurance, that money never actually belonged to the insurance companies.

The Supreme Court has made it clear that the federal fraud statutes should be "interpreted broadly insofar as property rights are concerned." *McNally v. United States*, 483 U.S. 350, 356 (1987); *see also United States v. Mancuso*, 42 F.3d 836, 845 (4th Cir. 1994) (stating that "the scope of property interests protected is to be construed fairly widely"). The Government need not prove that the victim suffered a monetary loss as a result of the alleged fraud; it is sufficient that the victim was deprived of some right over its property. *Carpenter v. United States*, 484 U.S. 19, 26-27 (1987). In the analogous context of the federal bank fraud statute, we have stated that property is anything in which a person has a "right that could be assigned, traded, bought, and otherwise disposed of." *Mancuso*, 42 F.3d at 845.

A property owner has an intangible right to control the disposition of its assets. *See Crane v. Commissioner*, 331 U.S. 1, 6 (1947). The Supreme Court noted in *McNally* that the defendant's mail fraud conviction might have been affirmed had the jury been "charged that to convict it must find that the Commonwealth was deprived of control over how its money was spent." 483 U.S. at 360. Since *McNally* was

decided, several other circuits have concluded that the mail fraud and wire fraud statutes cover fraudulent schemes to deprive victims of their rights to control the disposition of their own assets. *See United States v. Welch*, 327 F.3d 1081, 1108 (10th Cir. 2003); *United States v. Dinome*, 86 F.3d 277, 283-84 (2d Cir. 1996); *United States v. Madeoy*, 912 F.2d 1486, 1492 (D.C. Cir. 1990); *United States v. Shyres*, 898 F.2d 647, 652 (8th Cir. 1990); *United States v. Kerkman*, 866 F.2d 877, 880 (6th Cir. 1989); *United States v. Fagan*, 821 F.2d 1002, 1011 n.6 (5th Cir. 1987); *cf. United States v. Catalfo*, 64 F.3d 1070, 1077 (7th Cir. 1995) (concluding that the victim had a property interest in "the right to control its risk of loss").

In this case, the insurance companies did, in fact, suffer monetary losses as the result of Gray's fraud. The money that Gray received was money that belonged to the insurance companies: They wrote the checks, and those checks were backed by the insurance companies' assets. Payment of benefits to Gray represented a loss to the insurance companies and no one else. Moreover, Minnesota Mutual and Interstate Assurance had a property interest in controlling the disposition of their assets, *i.e.*, paying out benefits in accordance with policy terms and applicable law. By killing Robert Gray and Goode, Gray manufactured the occurrences that gave rise to the insurance companies' payment obligations. By submitting claims for benefits under the policies, without acknowledging her culpability in the insureds' deaths, Gray sought to obtain money from the insurance companies under false pretenses and to interfere with their ability to dispose of their own assets in the proper manner.[2]

---

[2]Other courts have affirmed fraud convictions where the defendant, like Gray, created the circumstances giving rise to a claim and then made a claim for benefits under the policy. *See*, *e.g.*, *United States v. Hartmann*, 958 F.2d 774, 780-81 (7th Cir. 1992) (affirming convictions for mail fraud and wire fraud where the defendant participated in the murder of her husband in order to obtain benefits under life and mortgage insurance policies); *United States v. Duncan*, 919 F.2d 981, 990-92 (5th Cir. 1990) (affirming a mail fraud conviction where the defendant participated in staged car accidents in order to obtain benefits under hospitalization insurance policies); *United States v. Candoli*, 870 F.2d 496, 511 (9th Cir. 1989) (affirming a mail fraud conviction where the defendant participated in a conspiracy to commit arson and then made claims for insurance benefits); *United States v. Lundy*, 809 F.2d 392, 397 (7th Cir. 1987) (same).

Gray contends that the insurance companies were merely disinterested third parties that held the insureds' money for the named beneficiaries. Thus, the only true victims of Gray's fraud were the rightful beneficiaries under the policies, not the insurance companies. Whether or not the insurance companies paid the proper parties at the end of the day, they would not have been required to pay *anyone* had Gray not killed their insureds. In other words, the insurance companies were deprived of the use of their assets by Gray's accelerating the necessity to pay benefits.[3] Taken in the light most favorable to the Government, the evidence supports the jury's finding that Gray intended to deprive the insurance companies of their "money" and "property" by means of a fraudulent scheme.

B.

Gray next contends that her conviction on Counts One through Four — the counts relating to the Minnesota Mutual policy on Robert Gray — should be vacated because the evidence was not sufficient to prove that she lied to police about her involvement in Robert Gray's death with the intent to defraud Minnesota Mutual. Again, we must affirm Gray's conviction on these counts if the evidence was "adequate and sufficient to support a conclusion of [her] guilt beyond a reasonable doubt." *Burgos*, 94 F.3d at 862.

"Even in the absence of a fiduciary, statutory, or other independent legal duty to disclose material information, common-law fraud includes acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent the other party from acquiring material information." *United States v. Colton*, 231 F.3d 890, 898 (4th Cir. 2000). Although simple nondisclosure generally is not sufficient

---

[3]As Gray herself notes, Interstate Assurance *disclaimed* its interest in the benefits payable under its policy when it filed its interpleader action, a step that was necessary because Interstate Assurance held an interest in those funds before that point, *i.e.*, the time when Gray was executing her fraudulent scheme. Moreover, Gray's contention that the insurance companies merely held the insured's funds for eventual payment to the rightful beneficiaries is refuted by the fact that both Minnesota Mutual and Interstate Assurance paid out much more in benefits than they had received in premiums paid by their insureds.

to constitute fraud, the Supreme Court has noted that "mere silence is quite different from concealment," and in some cases "a suppression of the truth may amount to a suggestion of falsehood." *Stewart v. Wyoming Cattle Ranche Co.*, 128 U.S. 383, 388 (1888). Thus, we have stated that "deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter" may constitute fraud. *Colton*, 231 F.3d at 899.

The evidence showed that Gray killed Robert Gray, at least in part, in order to obtain life insurance benefits under his Minnesota Mutual policy. During the police investigation of Robert Gray's murder, Gray did not remain silent. Rather, she falsely denied any involvement in the murder, falsely denied owning a gun matching the description of the murder weapon, and even offered a false alibi. Gray's conduct helped keep police investigators — and Minnesota Mutual, which relied upon the police investigation — from determining that she was involved in Robert Gray's death.

By 2001, when Gray learned that the excess benefit was available, Gray had already been made aware that insurance companies could not pay benefits to their insureds' murderers. LINA and Interstate Assurance had resisted paying benefits to Gray specifically because they suspected that she was involved in the murders of Robert Gray and Goode, and Gray confronted the issue directly in the Interstate Assurance interpleader action. In light of this experience with other insurance companies, Gray responded to the news that the excess benefit was available by calling Minnesota Mutual to inquire whether she would be entitled to a double-indemnity benefit if Robert Gray's death was accidental. Of course, Gray knew that his death was not accidental. When she ultimately submitted her claim for the excess benefit, Gray made no mention of her involvement in the murder and did not correct any of the false information she had earlier given to the police. Thus, from the time of Robert Gray's murder, Gray actively concealed information that was critical to Minnesota Mutual's payment obligations.[4] Taken in the light most favorable to the

---

[4]Gray argues that the evidence fails to show that she defrauded Minnesota Mutual with respect to the mortgage payoff to Perpetual Savings Bank in 1991. Although the evidence concerning the mortgage payoff to

Government, the evidence was sufficient to prove that Gray intended to defraud Minnesota Mutual and thus sufficient to support Gray's conviction on Counts One through Four.

## C.

Gray argues that her conviction on Counts Seven and Eight — the mail fraud counts relating to the pleadings she filed in the Interstate Assurance interpleader action — should be vacated because the district court relied on evidence presented *after* she moved for a judgment of acquittal under Fed. R. Crim. P. 29 and the district court reserved ruling on that motion. We review *de novo* the district court's denial of a motion for judgment of acquittal. *United States v. Gallimore*, 247 F.3d 134, 136 (4th Cir. 2001).

In order to obtain a conviction under the mail fraud statute, the Government must prove that the defendant caused the United States mails to be used in furtherance of a fraudulent scheme. 18 U.S.C. § 1341. Counts Seven and Eight of the indictment alleged that Gray caused two specific pleadings to be mailed "from Rockville, Maryland to the Circuit Court of Baltimore City, Maryland in Baltimore, Maryland." J.A. 31-32.

At the hearing on Gray's Rule 29 motion, Gray's counsel argued that the Government's evidence failed to prove that these pleadings

Perpetual Savings Bank was important to describe the context of the fraud on Minnesota Mutual, it was not necessary for conviction on Counts One through Four. Those counts charged Gray with making specific telephone calls and causing specific mailings in April and May 2001 in connection with her claim for the excess benefit, not the mortgage payoff. The evidence established that the excess benefit would not have been available at all but for Gray's killing Robert Gray in 1991. Other evidence proved that Gray intended to profit by the murder, and that was sufficient to prove a scheme to defraud Minnesota Mutual of insurance benefits. The fact that Gray did not make a claim for the mortgage payoff — she could not make such a claim under the policy — in no way diminishes the evidence establishing that she killed Robert Gray in order to make available the claim for insurance benefits that she later invoked.

had been mailed to the courthouse. The Government replied that it was relying upon three pieces of circumstantial evidence: (1) the certificates of service showing that the person responsible for the pleadings mailed them to opposing counsel, (2) the date stamps on the file-stamped copies of the pleadings, indicating that the pleadings were received by the court several days after the date shown on the certificates of service, and (3) the law firm that represented Gray was located in Rockville, Maryland, while the court was located in Baltimore.

After the district court announced that it would reserve ruling on the Rule 29 motion, the Government moved to reopen its case-in-chief in order to present testimony from Gray's former counsel concerning the manner in which he typically filed pleadings. The district court granted the Government's motion, and Gray's former attorney, John Kudel, testified that he mailed the pleadings at issue in Counts Seven and Eight to the Circuit Court of Baltimore City. The district court later denied Gray's Rule 29 motion.

Gray argues that the district court was not permitted to consider Kudel's testimony under Rule 29(b), which states that

> The court may reserve ruling on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. *If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.*

(Emphasis added.) The final sentence of the Rule was intended to address the problem that arises "where the defense decides to present evidence and run[s] the risk that such evidence will support the government's case." Fed. R. Crim. P. 29(b) advisory committee note. Thus, a district court may not reserve ruling on a defendant's motion for judgment of acquittal and then later penalize the defendant by relying upon the defendant's own evidence to deny the motion. *See United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002) ("The district court in this case reserved Wahl's motion at the close of the gov-

ernment's case. Any ruling on that motion, then, should have been made solely on the evidence offered by the government.").

The mailings alleged in Counts Seven and Eight were proved solely by the Government's evidence, not Gray's. Nevertheless, Gray contends that the district court improperly considered the evidence presented by the Government after it initially rested. Under Gray's theory, a district court's reserving its ruling on a defendant's Rule 29 motion seals the evidentiary record completely for purposes of that motion, even excluding the possibility that the Government may reopen its case-in-chief.

We disagree. Rule 29 provides that a district court may grant a motion for judgment of acquittal only "[a]fter the government closes its evidence or after the close of all the evidence." Fed. R. Crim. P. 29(a). Where the district court properly permits the Government to reopen its case-in-chief, *see United States v. Abbas*, 74 F.3d 506, 510 (4th Cir. 1996), it cannot be said that the Government "closes its evidence" before the conclusion of its *reopened* case.[5] Likewise, the district court cannot be said to reserve decision under Rule 29 until that time, when a decision would otherwise be appropriate. Under Rule 29(b), the district court would be permitted to consider *all* of the evidence presented in the Government's case-in-chief — before and after

---

[5]A district court may allow the Government to reopen its case even after the defendant makes a Rule 29 motion. *See United States v. Mojica-Baez*, 229 F.3d 292, 299-300 (1st Cir. 2000) (affirming the district court's reopening the Government's case to present a stipulation proving a bank's federally-insured status); *United States v. Rouse*, 111 F.3d 561, 573 (8th Cir. 1997) (affirming the district court's reopening the Government's case to present a stipulation establishing that the charged offenses occurred on federal lands); *United States v. Leslie*, 103 F.3d 1093, 1104 (2d Cir. 1997) (affirming the defendant's conviction where the Government presented evidence of a bank's federally-insured status only after the defendant moved for judgment of acquittal). As the Ninth Circuit has noted, "[o]ne purpose of Rule 29 motions is to alert the court to omitted proof so that, if it so chooses, it can allow the government to submit additional evidence." *United States v. Suarez-Rosario*, 237 F.3d 1164, 1167 (9th Cir. 2001) (affirming the district court's decision to allow the Government to reopen its case to prove the defendant's identity).

the district court permitted reopening — when it ultimately rules on the Rule 29 motion.[6]

The district court permitted the Government to reopen its case for the limited purpose of presenting testimony from Kudel establishing that he mailed the pleadings specified in Counts Seven and Eight. The Government initially intended to present this testimony — Kudel was on the Government's witness list — but inadvertently rested without putting him on the witness stand. Kudel's testimony was plainly relevant, admissible, and helpful to the jury, and Gray had ample opportunity to cross-examine him. There was no unfair surprise and no risk of distorting the importance of Kudel's testimony. Accordingly, the district court did not abuse its discretion in permitting the Government to reopen its case-in-chief to present this evidence, *see Abbas*, 74 F.3d at 511 (describing the factors to be considered in ruling on a motion to reopen), and it was entirely appropriate for the district court to consider Kudel's testimony in denying Gray's Rule 29 motion.

## D.

Gray seeks a new trial based upon the district court's admission of testimony concerning (1) her involvement in Stribbling's murder and (2) Robert Gray's fear for his safety. We review the district court's evidentiary rulings for abuse of discretion. *See United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997).

## 1.

Over Gray's objection, the district court admitted certain testimony concerning the 1974 murder of Stribbling, Gray's first husband. The jury heard testimony describing the crime scene and the autopsy results, as well as testimony from two men who claimed that Gray had solicited them (unsuccessfully) to kill Stribbling for money.

---

[6]So long as the district court acted within its discretion in permitting the Government to reopen its case-in-chief, the defendant cannot complain that he has been deprived of the protection afforded by Rule 29(b). In no event can the defendant's evidence be used to deny his Rule 29 motion.

Another witness testified that Gray had offered her money to provide Gray an alibi for the time of the murder. Finally, the jury heard testimony from one witness (in addition to Wilma Jean Wilson) who said that Gray had admitted shooting Stribbling. The district court instructed the jury that the evidence concerning the Stribbling murder was admitted only "as it may relate to the defendant's motivation with regard to the conduct alleged in this case relating to William Robert Gray. You may not consider it for any other purpose." J.A. 649.

Gray contends that this evidence should have been excluded under Fed. R. Evid. 404(b), which provides as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

We have noted that "Rule 404(b) is viewed as an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." *United States v. Young*, 248 F.3d 260, 270-71 (4th Cir. 2001) (internal quotations omitted).

Evidence of "other crimes" is admissible under Rules 404(b) and 403 if four conditions are satisfied. First, "[t]he evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. In this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes." *Queen*, 132 F.3d at 997. Second, "[t]he act must be necessary in the sense that it is probative of an essential claim or an element of the offense." *Id.* Third, "[t]he evidence must be reliable." *Id.* Finally, "the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process." *Id.*

All four conditions are satisfied here. The Government was required to prove that Gray intentionally killed Robert Gray and then intentionally concealed her crime from Minnesota Mutual and LINA.

The defense argued at trial, however, that Gray was merely a passive beneficiary of Robert Gray's death; she was not involved in his murder in any way; and the fact that she collected insurance proceeds under Robert Gray's policies was entirely coincidental. In light of the evidence proving that Gray killed Robert Gray, the evidence concerning the Stribbling murder was "useful as reducing the possibility that the [killing of Robert Gray] was done with innocent intent." *Queen*, 132 F.3d at 995 (internal quotations omitted). Thus, this evidence was relevant.

Because a conviction of mail fraud requires proof that the defendant intended to defraud the victim, *see Dan River, Inc. v. Icahn*, 701 F.2d 278, 291 (4th Cir. 1983), the evidence concerning the Stribbling murder was also necessary. This evidence proved that Gray participated in the murder of her first husband with the assistance of Robert Gray and later collected insurance proceeds under her husband's policy. She later killed Robert Gray in order to eliminate the only witness to the Stribbling murder and to collect even more insurance proceeds. Although the Government was not required to prove Gray's particular motive for killing Robert Gray, this evidence was probative of her intent to commit the murder and defraud the insurance companies.

The evidence was also reliable. The jury heard testimony from Gray's friend Wilma Jean Wilson (to whom Gray confessed killing her first husband), other witnesses whom Gray solicited to kill Stribbling and to provide a false alibi for her, police officers who described the Stribbling murder scene, and insurance company representatives who explained how Gray benefitted from Stribbling's death. These witnesses testified under oath and were subject to cross-examination, such that Gray had ample opportunity to challenge the reliability of their accounts.

Finally, the probative value of this evidence was not substantially outweighed by its prejudicial impact, "in the sense that it tend[ed] to subordinate reason to emotion in the factfinding process." *Queen*, 132 F.3d at 997. The district court excluded other evidence concerning the Stribbling murder and carefully limited the scope of the Government's case on this issue. In addition, the district court specifically instructed the jury that it could consider evidence concerning the Stribbling murder only in connection with the murder of Robert Gray

and not for any other purpose. This evidence was probative, and although it was harmful to Gray, it was not unduly prejudicial. In sum, the district court did not abuse its discretion in admitting testimony concerning Gray's involvement in the Stribbling murder.

2.

The district court also admitted into evidence several out-of-court statements made by Robert Gray during the three months preceding his murder:

> Robert Gray's criminal complaint alleging that Goode had tossed a 9-millimeter handgun on the table at his house to provoke an argument;

> Robert Gray's criminal complaint alleging that Gray had tried to stab him with a knife and attack him with a club;

> Statements made by Robert Gray to Darnell Gray and a police detective, claiming that Gray and Goode had assaulted him in October 1990; and

> Statements made by Robert Gray to Rodney Gray claiming that Goode had pulled a gun on him outside a restaurant in September or October 1990.

Although out-of-court statements ordinarily may not be admitted to prove the truth of the matters asserted, the doctrine of forfeiture by wrongdoing allows such statements to be admitted where the defendant's own misconduct rendered the declarant unavailable as a witness at trial. The Supreme Court applied this doctrine in *Reynolds v. United States*, 98 U.S. 145 (1878), stating that "[t]he Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by [the accused's] own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away." *Id.* at 158. By 1996, every circuit to address the issue had recognized this doctrine. *See United States v. Houlihan*, 92 F.3d 1271, 1280 (1st Cir. 1996); *United States v. Mastrangelo*, 693 F.2d 269,

273-74 (2d Cir. 1982); *Steele v. Taylor*, 684 F.2d 1193, 1202 (6th Cir. 1982); *United States v. Thevis*, 665 F.2d 616, 631 (5th Cir. 1982); *United States v. Balano*, 618 F.2d 624, 629 (10th Cir. 1979); *United States v. Carlson*, 547 F.2d 1346, 1357 (8th Cir. 1976).[7]

Fed. R. Evid. 804(b)(6), which took effect in 1997, codifies the common-law doctrine of forfeiture by wrongdoing as an exception to the general rule barring admission of hearsay evidence. Fed. R. Evid. 804(b)(6) advisory committee note. Under Rule 804(b)(6), "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did procure the unavailability of the declarant as a witness" is admissible at trial. In order to apply the forfeiture-by-wrongdoing exception, the district court must find, by the preponderance of the evidence, *see United States v. Scott*, 284 F.3d 758, 762 (7th Cir. 2002),[8] that (1) the defendant engaged or acquiesced in wrongdoing (2) that was intended to render the declarant unavailable as a witness and (3) that did, in fact, render the declarant unavailable as a witness. The district court need not hold an independent evidentiary hearing if the requisite findings may be made based upon evidence presented in the course of the trial. *United States v. Johnson*, 219 F.3d 349, 356 (4th Cir. 2000).

Gray contends that Rule 804(b)(6) should not apply in this case because she did not intend to procure Robert Gray's unavailability as a witness at *this* trial. "Because the Federal Rules of Evidence are a legislative enactment, we turn to the traditional tools of statutory construction in order to construe their provisions. We begin with the language itself." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 163 (1988). The text of Rule 804(b)(6) requires only that the defendant

---

[7]The Supreme Court recently confirmed the continuing vitality of the forfeiture-by-wrongdoing doctrine. *See Crawford v. Washington*, 124 S. Ct. 1354, 1370 (2004).

[8]In addition to *Scott*, see *United States v. Zlatogur*, 271 F.3d 1025, 1028 (11th Cir. 2001); *United States v. Dhinsa*, 243 F.3d 635, 653-54 (2d Cir. 2001); *United States v. Cherry*, 217 F.3d 811, 815 (10th Cir. 2000); *United States v. Emery*, 186 F.3d 921, 926-27 (8th Cir. 1999); *United States v. White*, 116 F.3d 903, 912 (D.C. Cir. 1997); *Houlihan*, 92 F.3d at 1280. The Fifth Circuit requires proof of the predicate facts by clear and convincing evidence. *Thevis*, 665 F.2d at 631.

intend to render the declarant unavailable "as a witness." The text does not require that the declarant would otherwise be a witness at any *particular* trial, nor does it limit the subject matter of admissible statements to events distinct from the events at issue in the trial in which the statements are offered. Thus, we conclude that Rule 804(b)(6) applies *whenever* the defendant's wrongdoing was intended to, and did, render the declarant unavailable as a witness against the defendant, without regard to the nature of the charges at the trial in which the declarant's statements are offered. *Accord Dhinsa*, 243 F.3d at 652-53; *Emery*, 186 F.3d at 926; 4 C. Mueller & L. Kirkpatrick, *Federal Evidence* § 507.1, at 268 (2d ed. Supp. 2004) ("It seems that there is no limit on the subject matter of statements that can be admitted under this exception, which means that statements in which the declarant implicates a defendant in a plot to kill the declarant himself can fit the exception.").

Our interpretation of Rule 804(b)(6) advances the clear purpose of the forfeiture-by-wrongdoing exception. The advisory committee noted its specific goal to implement a "prophylactic rule to deal with abhorrent behavior which strikes at the heart of the system of justice itself." Fed. R. Evid. 804(b)(6) advisory committee note (internal quotations omitted); *see also United States v. Thompson*, 286 F.3d 950, 962 (7th Cir. 2002) (stating that "the primary reasoning behind this rule" is "to deter criminals from intimidating or 'taking care of' potential witnesses against them"). More generally, federal courts have recognized that the forfeiture-by-wrongdoing exception is necessary to prevent wrongdoers from profiting by their misconduct. *See Reynolds*, 98 U.S. at 158-59 (holding that a criminal defendant waives his right to confront a witness whose absence his own misconduct procured and stating that this rule "has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong"); *Emery*, 186 F.3d at 926 (stating that the Rule "establishes the general proposition that a defendant may not benefit from his or her wrongful prevention of future testimony from a witness or potential witness"); *White*, 116 F.3d at 911 (stating that "where the defendant has silenced a witness through the use of threats, violence or murder, admission of the victim's prior statements at least partially offsets the perpetrator's rewards for his misconduct"); *Houlihan*, 92 F.3d at 1279 (applying the forfeiture-by-wrongdoing exception and noting that "courts will not suffer a party to profit by his own wrongdoing").

Federal courts have sought to effect the purpose of the forfeiture-by-wrongdoing exception by construing broadly the elements required for its application. *See*, *e.g.*, *Dhinsa*, 243 F.3d at 652 (noting that the Rule may apply where the declarant was only a potential witness, *i.e.*, "there was no ongoing proceeding in which the declarant was scheduled to testify"); *Cherry*, 217 F.3d at 820 (holding that the declarant's statements may be admitted against a person who participated in a conspiracy to silence the declarant even if that person did not himself engage in witness intimidation or other wrongdoing); *Steele*, 684 F.2d at 1201 (stating that "any significant interference" with the declarant's appearance as a witness, including the exercise of "persuasion and control" or an instruction to invoke the Fifth Amendment privilege, amounts to wrongdoing that forfeits the defendant's right to confront the declarant). Although the Rule requires that the wrongdoing was *intended* to render the declarant unavailable as a witness, we have held that a defendant need only intend "in part" to procure the declarant's unavailability. *Johnson*, 219 F.3d at 356; *accord Dhinsa*, 243 F.3d at 654; *Houlihan*, 92 F.3d at 1279.

Like these applications of the forfeiture-by-wrongdoing exception, our interpretation of Rule 804(b)(6) ensures that a defendant will not be permitted to avoid the evidentiary impact of statements made by his victim, whether or not he suspected that the victim would be a witness at the trial in which the evidence is offered against him. A defendant who wrongfully and intentionally renders a declarant unavailable as a witness in any proceeding forfeits the right to exclude, on hearsay grounds, the declarant's statements at that proceeding and any subsequent proceeding. *See United States v. Aguiar*, 975 F.2d 45, 47 (2d Cir. 1992) (affirming the district court's admission of hearsay testimony to prove witness tampering as well as an underlying drug conspiracy, and stating that "[a] defendant who procures a witness's absence waives the right of confrontation for all purposes with regard to that witness").[9]

---

[9]We emphasize that the intent requirement in Rule 804(b)(6) continues to limit application of the forfeiture-by-wrongdoing exception to those cases in which the defendant intended, at least in part, to render the declarant unavailable as a witness against him. *See Johnson*, 219 F.3d at 356. Absent such intent, Rule 804(b)(6) has no application.

Having rejected Gray's interpretation of Rule 804(b)(6), we need only determine whether the district court properly applied the Rule in admitting Robert Gray's out-of-court statements. Those statements were admissible only if the district court properly found, by a preponderance of the evidence, that (1) Gray engaged in some wrongdoing (2) that was intended to procure Robert Gray's unavailability as a witness and (3) that did, in fact, procure his unavailability as a witness. The district court in this case found that Robert Gray "was killed prior to the court date on November 15 and 16, and after the defendant was well aware of his status as a witness, justifies the inference that . . . the killing was motivated . . . to prevent [Robert Gray] from being available . . . at court proceedings." J.A. 205. These findings are supported by the evidence and are sufficient to warrant application of the Rule 804(b)(6). Accordingly, the district court did not abuse its discretion in admitting testimony concerning out-of-court statements made by Robert Gray.

III.

In addition to challenging her conviction, Gray argues in a supplemental brief that her sentence should be vacated in light of the Supreme Court's recent decision in *United States v. Booker*, 125 S. Ct. 738 (2005). Because Gray did not object to her sentence in the district court, our review is for plain error. *See United States v. Olano*, 507 U.S. 725, 731-32 (1993); Fed. R. Crim. P. 52(b). Under this standard of review, "[t]here must be an error that is plain and that affects substantial rights. Moreover, Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732 (internal quotations omitted).

The district court calculated Gray's sentence using two alternative methods. In the first calculation, the district court applied a cross-reference to the first-degree murder guideline, U.S.S.G. § 2A1.1. In order to apply this guideline, the district court first had to find that Gray's intentional murders of Gray and Goode were premeditated. Under § 2A1.1, Gray's base offense level was 43. In the second calculation, the district court started with the base offense level for mail fraud and then applied enhancements for two specific offense charac-

teristics — (1) the offense involved more than one victim and (2) the offense involved possession of a firearm. The court then departed upward under U.S.S.G. § 5K2.1 based upon a finding that Gray's schemes to defraud involved two premeditated murders. The result of this second calculation was an adjusted offense level of 43. Under either calculation, Gray's sentence was increased based upon a factual finding — that the murders of Robert Gray and Goode were premeditated — that the jury was not required to make.

This case is similar to *United States v. Hughes*, ___ F.3d ___, 2005 WL 628224 (4th Cir. Mar. 16, 2005), where we vacated a criminal sentence and remanded for resentencing in accordance with *Booker*. As in *Hughes*, the district court here imposed the sentence mandated by the Sentencing Guidelines, based in part upon a fact that was not found by the jury. *See id.* at *5 (concluding that application of sentencing enhancements based on judge-found facts was "error" that was "plain"). As in *Hughes*, the defendant here was sentenced to a longer term of imprisonment than the Sentencing Guidelines would have required had the district court not considered that fact. *See id.* at *5-*6 (concluding that imposition of a sentence in excess of the maximum sentence permitted by the jury's verdict affected the defendant's substantial rights). Consistent with *Hughes*, we conclude that the district court committed an error that was plain and that affects Gray's substantial rights, and we exercise our discretion to notice the error. Accordingly, we remand this case for resentencing in accordance with *Booker*.[10]

---

[10]Although the Sentencing Guidelines are no longer mandatory, *Booker* makes clear that a sentencing court must still "consult [the] Guidelines and take them into account when sentencing." 125 S. Ct. at 767. On remand, the district court should first determine the appropriate sentencing range under the Guidelines, making all factual findings appropriate for that determination. *Hughes*, 2005 WL 628224, at *4. The court should consider this sentencing range along with the other factors described in 18 U.S.C. § 3553(a), and then impose a sentence. *Id.* If that sentence falls outside the Guidelines range, the court should explain its reasons for the departure, as required by 18 U.S.C. § 3553(c)(2). *Id.* The sentence must be "within the statutorily prescribed range and . . . reasonable." *Id.*

IV.

We affirm Gray's conviction for mail fraud and wire fraud. The evidence was sufficient to prove all the elements of each offense, and the district court's evidentiary rulings were correct. We vacate the sentence, however, and remand for resentencing in accordance with *Booker*.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*