PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                          No. 11-4942

GARY LEE GILLION,
            *Defendant-Appellant.*

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Joseph F. Anderson, Jr., District Judge.
(3:10-cr-00834-JFA-1)

Argued: October 26, 2012

Decided: December 28, 2012

Before GREGORY and DUNCAN, Circuit Judges, and
Samuel G. WILSON, United States District Judge for the
Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Gregory and Judge Wilson joined.

## COUNSEL

**ARGUED:** Eric William Ruschky, Columbia, South Carolina, for Appellant. Winston David Holliday, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Car-

olina, for Appellee. **ON BRIEF:** John A. O'Leary, O'LEARY & ASSOCIATES, INC., Columbia, South Carolina, for Appellant. William N. Nettles, United States Attorney, Columbia, South Carolina, for Appellee.

---

## OPINION

DUNCAN, Circuit Judge:

This appeal arises from Gary Lee Gillion's convictions on four counts of mail fraud, in violation of 18 U.S.C. § 1341, and one count of conspiring to commit mail fraud, in violation of 18 U.S.C. § 371. Gillion challenges the sufficiency of the evidence underlying his convictions, as well as the district court's admission of statements he made pursuant to a pre-indictment proffer agreement with the Government. For the following reasons, we affirm.

I.

A.

Gillion became southeastern regional manager of CitiCapital Trailer Rental ("CitiCapital"), a trailer leasing company owned by CitiGroup, in 2000. Gillion was based in CitiCapital's Columbia, South Carolina office. His duties as regional manager included overseeing the profit of the region's branches, monitoring sales contracts, and ensuring that branches complied with company policies.

Prior to becoming a regional manager at CitiCapital, Gillion worked with a number of trailer leasing companies. Throughout his career, he maintained a business relationship and friendship with John DalCanton, a trailer leasing executive. DalCanton was serving as CitiCapital's vice president in its Dallas, Texas headquarters when the events leading to Gillion's convictions transpired.

In early December 2003, DalCanton visited Gillion in Columbia and told him that CitiGroup was considering selling CitiCapital. Concerned that the sale would mean Gillion and DalCanton would lose their jobs, Gillion told DalCanton he had created a side company—Capital City Trailer ("Capital City")—to "make some money" in case CitiCapital laid them off. J.A. 267. Records reveal that Gillion opened a business checking account in Capital City's name on November 15, 2003.

DalCanton, who later pleaded guilty to conspiring to commit mail fraud and testified against Gillion at trial, described three ways he and Gillion used Capital City to defraud Citi-Capital and purloin profits beginning in late 2003. First, Gillion would arrange sales of Columbia-based trailers, checking the book value of the trailers with DalCanton before finalizing each sale. Gillion would then sell the trailers for more than book value, write a cashier's check to CitiCapital for the book value of the sale, and keep the profits above book value to split with DalCanton. Second, Gillion and DalCanton would arrange secret leases of the Columbia-based trailers and keep the lease payments as profits. Third, Gillion and DalCanton would arrange lease-to-own contracts on behalf of Capital City with potential CitiCapital customers, who would lease trailers from Capital City for a number of months, then purchase the trailers outright for a nominal sum at the end of the period. DalCanton would either not report the nominal purchase to Citigroup or "create a nominal purchase to cover up these rentals" so he and Gillion could keep the lease payments. J.A. 271. On at least one occasion, described in detail below, Gillion and DalCanton arranged for CitiCapital to sell Capital City the trailers it needed to execute a lease-to-own contract during the lease period, so Capital City could reap the lease-to-own contract profits outright.

The third strategy forms the basis for Gillion's mail fraud convictions. The scheme involved Baker Transportation ("Baker"), a South Carolina trucking company which had

been a Columbia-based CitiCapital customer for several years. The government and Gillion presented conflicting information as to whether Baker would have remained a Citi-Capital customer as of late 2003. William Baker, the company's owner, testified that there was no reason to believe his relationship with CitiCapital would end in 2003 or 2004 and that he had no plans to take his business elsewhere. J.A. 486. The CitiCapital salesman in charge of Baker's account, Kevin Sparks, testified that Baker often made late payments and that he could not approve Baker's credit for further trailer rentals in 2003. J.A. 675. Sparks also testified, however, that Gillion could override credit determinations and give customers additional credit. J.A. 679.

On October 28, 2003, Gillion, acting as president of Capital City, signed a lease-to-own agreement with Baker. The agreement named eight forty-eight-foot trailers by serial number. Baker testified that these were "the 48-foot trailers that [he] liked to purchase" and that the agreement was "basically the same purchase plan" as his previous CitiCapital contract. J.A. 487. Baker agreed to make lease payments to Capital City over three years, from November 1, 2003, to November 1, 2006. J.A. 929. Each lease payment would be for $150 per trailer, per month, plus tax, with Baker receiving the option to purchase the trailers for one dollar at the end of the lease period. The contract listed a mailing address at which Baker would be invoiced and an address for Capital City.

As of October 28, 2003, however, neither Gillion nor Capital City owned the eight trailers named in the Baker lease. Rather, on December 11, 2003, Gillion had DalCanton approve a $16,000 sale of the eight named trailers from Citi-Capital to Capital City, at $2000 per trailer. This sale represented a $1241 loss for CitiCapital. The "used bill of sale" document listed, by serial number, the same eight forty-eight-foot trailers Gillion had already leased to Baker. Gillion did not sign his name to the sale document. Instead, to conceal his identity, he forged his brother-in-law's name—James B.

Pitts—as the Capital City purchaser. On February 11, 2004, DalCanton transferred the eight trailer titles from CitiCapital to Capital City. Between November 1, 2003, and November 1, 2006, Baker mailed lease payments totaling more than $43,200 to Gillion as president of Capital City. In particular, Baker mailed checks on April 27, 2006, May 25, 2006, June 29, 2006, and July 21, 2006. Over the course of the three-year lease, Capital City, Gillion, and DalCanton received over $27,000 in profits from the Baker deal.

Although CitiGroup did not sell CitiCapital in 2003, as DalCanton predicted, it did eventually sell the company. Citi-Capital came to rest in the hands of XTra Lease ("XTra"), a national trailer leasing company, in February of 2005. After purchasing CitiCapital, XTra's due diligence revealed accounting discrepancies that brought Capital City, DalCanton, and Gillion's names to the fore. XTra's inquiry led to a civil suit against Gillion for conversion and breach of fiduciary duty, in which Gillion was held liable to XTra for over one million dollars.

## B.

On March 23, 2010—before his eventual indictment—Gillion signed a proffer agreement with the government (the "Agreement"), pursuant to which he agreed to provide information about his actions while employed as a CitiCapital regional manager. He also agreed to "submit to polygraph examination(s) by any qualified polygraph examiner should [he] be requested to do so," acknowledging that "[f]ailure to pass to the satisfaction of the Government any polygraph examination administered pursuant to this Agreement constitutes a breach of the Agreement," which then allowed the Government to "use for any purpose any statements" Gillion made during the interview. J.A. 106. Absent breach, the Agreement barred the government from using Gillion's proffered statements against him. Pursuant to the Agreement, Gillion met with Special Agent Chris McClure on March 23,

2010, for an interview, during which he admitted that he had formed Capital City; leased and sold some CitiCapital trailers "in furtherance of the scheme"; assured some customers "that CitiCapital and Capital City were indeed sister companies"; used DalCanton to create "a cover trail using paper"; and run Capital City while working for CitiCapital. J.A. 620.

A federal grand jury issued a nine-count indictment on August 18, 2010, charging Gillion with one count of conspiring to embezzle from a common carrier, in violation of 18 U.S.C. § 371, and eight counts of embezzling from a common carrier, in violation of 18 U.S.C. § 660. On April 5, 2011, a grand jury issued an eight-count superseding indictment, charging Gillion with one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371, and seven counts of substantive mail fraud, in violation of 18 U.S.C. § 1341.

Before trial, the government requested that Gillion submit to a polygraph examination to test the truth of his original proffer interview. Gillion moved to suppress the statements he made during the pre-indictment proffer session, arguing that the Agreement had no effect post-indictment. The government contended that the Agreement was still in effect as a binding contract. The district court found the Agreement was still in effect, and held that Gillion could either sit for the polygraph examination—which would be limited to questions related to topics raised in the original proffer interview—or be found in breach. Gillion sat for the polygraph examination on June 6, 2011, but left the session midway, disputing the scope of the questions. As a result, the district court found Gillion in breach and allowed Agent McClure to testify to Gillion's proffered statements at trial.

During a jury trial in the United States District Court for the District of South Carolina, the government presented testimony from several witnesses, including DalCanton and McClure. The government's theory was that Gillion and Dal-Canton had an overarching scheme to deprive CitiCapital of

profits, and that the pair used the three methods DalCanton described—trailer sales, leases, and lease-to-own contracts—to do so. DalCanton testified to each method, including the documents surrounding the Baker deal, which represented the third, or lease-to-own, method of defrauding CitiCapital. Dal-Canton specifically testified to the used bill of sale document he signed which allowed Gillion to buy the trailers he needed for the Baker deal from CitiCapital; the $16,000 cashier's check Gillion used to purchase the trailers; and the fact that DalCanton did not recognize the name of James B. Pitts, the signature Gillion forged on the sale sheet. DalCanton stated that CitiCapital "would have loved a profitable deal" on the forty-eight-foot trailers Gillion contracted with Baker to lease. J.A. 281. He also testified that in furtherance of the scheme, he helped Gillion falsify a certificate of liability so that Capital City would appear to be legitimately insured as required by CitiCapital and that he requested that Gillion use cashier's checks to submit payments to CitiCapital and DalCanton to cover up the scheme. DalCanton testified to a letter he wrote to a former CitiCapital customer, asking them to "remit all payments" to Capital City, and the government produced an e-mail written by Gillion in which he informed a former Citi-Capital customer that Capital City was CitiCapital's "sister" company.

On June 15, 2011, the jury found Gillion guilty of four counts of substantive mail fraud, in violation of 18 U.S.C. § 1341, and one count of conspiring to commit mail fraud, in violation of 18 U.S.C. § 371.[1]

---

[1]Before submitting the case to the jury, the district court dismissed three of the substantive mail fraud counts (Counts 3, 4, and 6) because the court could not conclude, as a matter of law, that the checks that formed the basis for those counts had been delivered by mail. J.A. 640-41. The remaining four counts correspond to the four checks Baker mailed within the five-year limitations period, on April 27, 2006, May 25, 2006, June 29, 2006, and July 21, 2006. These four checks also serve as the overt acts underlying Count One, conspiracy to commit mail fraud.

Gillion filed a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c), challenging the sufficiency of the evidence underlying his convictions. The district court denied the motion, explaining that "sufficient evidence was presented to the jury to support its guilty verdict." J.A. 1184. It subsequently sentenced Gillion to 33 months' imprisonment, three years of probation, and restitution to XTra of $20,958.06. J.A. 1185-88. This appeal followed.

## II.

The issues before us on appeal are whether the district court erred in admitting the statements Gillion made during his proffer session and whether sufficient evidence supported Gillion's mail fraud convictions. We consider each issue in turn.

## A.

We first consider Appellant's contention that the district court erred in admitting the statements he made pursuant to his pre-indictment proffer Agreement. Although "we review evidentiary rulings for an abuse of discretion and will only overturn an evidentiary ruling that is arbitrary and irrational," *United States v. Cloud*, 680 F.3d 396, 401 (4th Cir. 2012) (internal quotation and citation omitted), Gillion's challenge to the district court's holding—that proffer agreements remain in effect post-indictment—is a question of law which we review de novo, *United States v. Lopez*, 219 F.3d 343, 346 (4th Cir. 2000).

Gillion argues that the government should not have been able to ask him to sit for a polygraph examination pursuant to the terms of the Agreement because the Agreement terminated upon his indictment. The government replies that proffer agreements are binding contracts construed by their terms, and that Gillion's Agreement allowed the government to request a polygraph at any time. The district court concluded

that the Agreement was enforceable as a binding contract, allowing the government to request that Gillion submit to a polygraph examination or be found in breach. After Gillion failed the polygraph examination by walking out of the interview, the district court found that he had breached the Agreement and allowed McClure to testify to the statements obtained during the proffer interview.

1.

A proffer agreement "defines the obligations of the parties and is intended to protect the defendant against the use of his or her statements, particularly in those situations in which the defendant has revealed incriminating information and the proffer session does not mature into a plea agreement." *Lopez*, 219 F.3d at 345 n.1. We interpret a proffer agreement based on the language it contains. *Id.* at 346-47. In sum, a proffer agreement operates like a contract; accordingly, we examine its express terms to determine whether the defendant is in breach. *See United States v. Liranzo*, 944 F.2d 73, 77 (2d Cir. 1991) (holding that proffer agreements are interpreted like contracts); *United States v. Chiu*, 109 F.3d 624, 625 (9th Cir. 1997) (same).

Gillion's argument here is unavailing. Nothing in the Agreement before us suggests a temporal limitation. Rather, it requires Gillion to be "fully truthful and forthright at any stage." J.A. 106. While Gillion is correct that basic principles of contract interpretation "counsel[ ] that we construe any ambiguities against [the] draftsman," *Maersk Line, Ltd. v. United States*, 513 F.3d 418, 423 (4th Cir. 2008), there is no such ambiguity here. As the government points out, the Agreement "contemplates the possibility of a breach and trial" in its provisions regarding the consequences of breach, making clear that it does not lapse post-indictment. Appellee's Br. at 38. Therefore, the district court correctly applied our precedent in "reject[ing] the defendant's argument that either the terms of the contract, or constitutional law or criminal law,

generally requires that the polygraph must be taken pre-indictment." J.A. 173.

2.

Even if the district court erred in requiring Gillion to adhere to the Agreement, admission of the proffered statements was harmless.**²** "In order to find a district court's error harmless, we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Cloud*, 680 F.3d at 401 (internal quotation and citation omitted); Fed. R. Crim. P. 52(a).

Gillion "submits that the admission of a 'confession' can hardly ever be 'harmless.'" Appellant's Reply Br. at 8. While a confession is "'the most probative and damaging evidence that can be admitted against [a defendant],'" *United States v. Johnson*, 400 F.3d 187, 197 (4th Cir. 2005) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)), we have found admission of a confession harmless when "'the jury would have returned a verdict of guilty' absent the confession," *id.* (quoting *United States v. Jones*, 913 F.2d 174, 177 (4th Cir. 1990)). In *Johnson*, we found admission of the defendant's confession harmless when the government "introduced an abundance of other evidence" and proved parts of the defendant's involvement "without *any* use of his statements." *Id.* at 197-98. Additionally, "[t]he settled law of this circuit recognizes that the testimony of a defendant's accomplices, standing alone and uncorroborated, can provide an adequate basis for conviction." *United States v. Burns*, 990 F.2d 1426, 1439 (4th Cir. 1993).

The statements admitted at trial from Gillion's proffer session involve facts proven by the government in other ways. In

---

**²**As counsel acknowledged at oral argument, the issue is subject to harmless error analysis.

particular, DalCanton testified as to all the information McClure provided (and in greater detail), including, for example, the methods he and Gillion used to defraud CitiCapital while employed there. Nor was DalCanton's testimony "uncorroborated"; rather, the government presented accompanying exhibits, such as the Baker lease, the CitiCapital bill of sale, and the Capital City cashier's check for the Baker trailer purchase, to corroborate DalCanton's descriptions of the fraud. Testimony from other witnesses also corroborated DalCanton's statements. For example, William Baker testified to the timing of the Baker contract, the fact that Gillion offered Baker "the 48-foot trailers that [he] liked to purchase" on "basically the same purchase plan" as his CitiCapital contract, and that Gillion would mail him invoices for the contract, which Baker would pay by mailing monthly checks to Capital City.

Further, Gillion's defense did not deny his involvement in the Capital City scheme; Gillion's attorney stated that he and the government "basically all agree on the facts" even before the district court issued its final ruling as to whether McClure would testify to the proffered statements because Gillion had breached the proffer. J.A. 221. Instead, Gillion's argument was primarily legal—that the government could not prove CitiCapital had a property interest in the profits Gillion obtained and that Gillion did not obtain the profits with material false representations. *Id.* at 216-20. Indeed, before the court's final ruling holding that the proffered statements would come in at trial, Gillion's attorney offered to "consent to a bench trial" and would have "consent[ed] to stipulated facts" because "the facts are the facts."[3] *Id.* at 221. Considering the testimony from DalCanton, Baker, and others, as well

---

[3]Gillion even benefited from the admission of the proffered statements, since he received credit for acceptance of responsibility under U.S.S.G. § 3E1.1 at sentencing, in part because the court found "the defendant essentially didn't challenge any of the factual matters" and went to trial to preserve a legal claim. S.J.A. 10.

as numerous documents evidencing the fraud, we find that even if the court below erred in admitting Gillion's proffered statements, their admission was harmless.

## B.

We next consider Appellant's argument that the district court erred in denying his Rule 29 motion for judgment of acquittal because the government failed to provide sufficient evidence of mail fraud. We review a district court's denial of a Rule 29 motion de novo. *United States v. Reid*, 523 F.3d 310, 317 (4th Cir. 2008). "We will uphold the verdict if, viewing the evidence in the light most favorable to the government, it is supported by substantial evidence." *Id.* "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Palacios*, 677 F.3d 234, 248 (4th Cir. 2012) (internal quotation and citation omitted).

We turn first to the requirements for a mail fraud conviction. The mail fraud statute criminalizes "devis[ing] or attempt[ing] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. To establish mail fraud, "the Government must prove that the defendant (1) knowingly participated in a scheme to defraud and (2) mailed, or caused to be mailed, anything 'for the purpose of executing such scheme.'" *United States v. Pierce*, 409 F.3d 228, 232 (4th Cir. 2005) (quoting 18 U.S.C. § 1341). Gillion raises multiple challenges to the sufficiency of the evidence presented to prove mail fraud, and we address each in turn.

## 1.

Gillion first contends that his mail fraud convictions should be vacated because the government failed to establish that his

employer, CitiCapital, had a "property interest in the subsequent profits from the renting of [the Baker] trailers." Appellant's Br. at 30. Although Gillion admits that he "purchased eight trailers from CitiCapital without disclosing his involvement in the purchase," *id.* at 29, and completed the purchase only after signing the Baker lease, *id.* at 17-18, he contends his nondisclosure and the timing of the Baker deal are of no consequence, since he ultimately took title to the trailers during the lease period. The government responds that CitiCapital was entitled to the Baker lease proceeds since Gillion negotiated a deal with CitiCapital property and fraudulently concealed his identity in order to purchase that property after the Baker contract had been signed. Therefore, "each payment . . . tied back to the lease, and the fraud creating the lease infected each payment with the same wrong." Appellee's Br. at 15. The district court found that the government presented sufficient evidence, including testimony from DalCanton, to support the jury's guilty verdict.

When determining whether the defendant has devised a scheme to obtain money or property by means of false or fraudulent pretenses, "[i]t is essential to a conviction under [the mail fraud statute] that the victim of the alleged fraud actually have an interest in the money or property obtained by the defendant." *United States v. Gray*, 405 F.3d 227, 234 (4th Cir. 2005). "The Supreme Court has made it clear that the federal fraud statutes should be 'interpreted broadly insofar as property rights are concerned,'" *id.* (quoting *McNally v. United States*, 483 U.S. 350, 356 (1987)). We have held "that property is anything in which a person has a 'right that could be assigned, traded, bought, or otherwise disposed of.'" *Id.* (quoting *United States v. Mancuso*, 42 F.3d 836, 845 (4th Cir. 1994)). Thus, "the 'property' of which a victim is deprived need not be tangible property." *United States v. Adler*, 186 F.3d 574, 576 (4th Cir. 1999). "[R]ather he need only be deprived of some right over that property such as the right to exclusive use," *id.*, or "the intangible right to control the disposition of [his] assets," *Gray*, 405 F.3d at 234.

We reject the contention that CitiCapital had no property interest in the lease-to-own payments that Gillion received for the Baker trailer lease. First, we recognize that the trailers themselves and the assignable lease-to-own contract constitute property within our definition of the term. *Id.* The question remains whether CitiCapital had an interest in that property. We conclude that it did.

Gillion devised a scheme to defraud CitiCapital in which he created a company with a very similar name to that of his employer. He then offered Baker "the 48-foot trailers that [Baker] liked to purchase" on "basically the same purchase plan," J.A. 487, as Baker's CitiCapital contract, thus entering a lease-to-own contract with a former (and potential future) CitiCapital client. Baker testified that until that point, he had no plans to take his business elsewhere. Notably, Gillion offered Baker eight specific trailers he did not yet own; on October 28, 2003, CitiCapital owned each trailer Gillion leased. Then, Gillion concealed his identity by forging a signature on CitiCapital's used trailer bill of sale so that he could purchase the eight specific trailers he had contracted to sell to Baker. Gillion's inside connection with DalCanton not only allowed him to purchase the eight trailers undetected, but also allowed him to obtain them for below book value (he paid $16,000 for trailers then worth $17,241.59). Over the length of the three-year lease-to-own period, Gillion received over $27,000 in profits from the Baker contract alone.

Concealing his identity to trick CitiCapital into selling the eight trailers itself constituted an interference in CitiCapital's right to dispose of its property. *See Gray*, 405 F.3d at 234 (holding that depriving a company of its "intangible right to control the disposition of its assets" constitutes mail fraud). In addition, CitiCapital held a property interest in the Baker payments, since they derived from the lease-to-own contract Gillion made using CitiCapital trailers, which Gillion fraudulently purchased after the fact. As DalCanton testified, the Baker deal was a profitable one that CitiCapital "would

have loved." J.A. 281. Instead of securing that deal for his employer, Gillion negotiated with his employer's property to contract for a three-year stream of profits. The fact that Gillion fraudulently transferred the trailers to Capital City during the lease period such that Baker ultimately took title to the trailers from Capital City rather than CitiCapital does not negate CitiCapital's property interest in the revenue stream attached to the trailer contract that Gillion negotiated with CitiCapital property. Therefore, we find that the government presented sufficient evidence for the jury to find that CitiCapital had a property interest in the Baker lease-to-own payments.

2.

Second, Gillion contends that the government presented insufficient evidence to prove that the Baker payments were obtained by means of material false or fraudulent pretenses, as required by 18 U.S.C. § 1341. Gillion's primary argument seems to be that the superseding indictment does not specifically allege the material false representations or concealments Gillion used to defraud CitiCapital of its interest in the Baker lease-to-own contract proceeds. We disagree.

To establish the existence of a scheme to defraud, the government must show that the defendant failed to disclose material information or made material misrepresentations. *See Neder v. United States*, 527 U.S. 1, 25 (1999) (holding that "materiality of falsehood is an element of the federal mail fraud . . . statute[ ]"). "'Even in the absence of a fiduciary, statutory, or other independent legal duty to disclose material information, . . . acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent the other party from acquiring material information,'" can comprise material misrepresentation or concealment of fact. *Gray*, 405 F.3d at 235 (quoting *United States v. Colton*, 231 F.3d 890, 898 (4th Cir. 2000)). Under this standard, "fraudulent concealment—without any misrepresentation or duty to

disclose—can constitute . . . fraud." *Id.* at 899. A misrepresentation is material if "'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'" *Neder*, 527 U.S. at 22 n.5 (quoting Restatement (Second) of Torts § 538 (1977)).

We find that the government provided sufficient evidence such that a jury could find that Gillion obtained the Baker profits by material false or fraudulent pretenses. First, the superseding indictment alleged that Gillion and DalCanton "used Capital City to divert to themselves money and resources from CitiCapital." J.A. 74. The indictment also alleged that "Capital City sold some of CitiCapital's trailers to entities controlled by [Gillion] and to third parties," and that Gillion received revenue "through revenue streams established using equipment formerly owned by CitiCapital and acquired by [Gillion]." J.A. 75. The government submitted ample evidence to the jury that Gillion used material false pretenses and concealment to execute the Baker contract, including multiple "acts taken to conceal . . . mislead, or otherwise deceive in order to prevent [CitiCapital] from acquiring material information." *Colton*, 231 F.3d at 898. The information regarding Gillion's identity as operator of a similarly-named competitor company engaged in purchasing trailers from CitiCapital for use with former CitiCapital clients was certainly material in that, had CitiCapital known of Gillion's involvement with Capital City, it would have "terminated" him at once, as DalCanton testified. Gillion and DalCanton concealed their alliance and used cashier's checks to maintain secrecy; this included the check used to pay for the Baker trailers. In a further attempt to conceal and misrepresent his identity, Gillion forged his brother-in-law's signature on the Baker trailer bill of sale.

Furthermore, the indictment alleged multiple misrepresentations in which Gillion engaged as part of his larger scheme to defraud CitiCapital of profits. The government proved each

of these misrepresentations at trial, including establishing that Gillion submitted a falsified credit request to DalCanton on behalf of Capital City, provided false assurances to customers that CitiCapital and Capital City were "sister organizations," and created false paper trails by using cashier's checks to pay CitiCapital and DalCanton.

Additionally, the district court properly instructed the jury on the government's burden in proving a scheme to defraud:

> Fraud includes acts taken to conceal, create a false impression, mislead or otherwise deceive in order to prevent another person from acquiring material information. Thus, a scheme to defraud can be shown by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or avert further inquiry into a material matter.
>
> The government can prove a scheme to defraud by evidence of active concealment of material information. A statement is material if it has a natural tendency to influence or is capable of influencing the decision-making body to which was addressed. The government must prove that the defendant acted with the specific intent to defraud.

J.A. 741. "We generally presume that jurors follow their instructions," *Penry v. Johnson*, 532 U.S. 782, 799 (2001), and see no reason to veer from that presumption here. Therefore, we find that the government submitted sufficient evidence to the jury such that it could find that Gillion obtained the Baker payments "by means of material false or fraudulent pretenses."

### 3.

Third, and finally, Gillion challenges his mail fraud convictions by contending that the mailings "were not for the pur-

pose of executing or attempting to execute the scheme to defraud." Appellant's Br. at 37. The government responds that the mailed checks represented the consummation of Gillion's fraud, as they allowed him to reap the profits of the fraudulent Baker deal.

A mailing "for the purpose of executing" the scheme to defraud need not be at the scheme's heart. Indeed, "it is not necessary that the scheme contemplate the use of the mail as an essential element." *Pereira v. United States*, 347 U.S. 1, 8 (1954). "[I]t is enough that the mailing be 'incident to an essential part of the scheme, or a step in the plot.'" *Pierce*, 409 F.3d at 232 (quoting *Schmuck v. United States*, 489 U.S. 705, 711 (1989)). "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used" even if the use is "incident to an essential part of the scheme." *Pereira*, 347 U.S. at 8-9; *see also United States v. Snowden*, 770 F.2d 393, 397 (4th Cir. 1985). In particular, "[m]ailings that occur subsequent to the commission of fraudulent acts by the defendants but which relate to the acceptance of the proceeds of the scheme have been upheld as the predicate for mail fraud convictions." *United States v. Blecker*, 657 F.2d 629, 636 (4th Cir. 1981).

We find that the government presented sufficient evidence for a jury to find the mailings from Baker to Capital City were for the purpose of executing the scheme to defraud. Gillion's scheme contemplated that once he had obtained the trailers necessary to fulfill the Baker lease-to-own contract from his employer, he would receive monthly payments from Baker during the three-year lease period. The lease itself made clear that Gillion would invoice Baker and provided an address for Capital City, making use of the mails foreseeable. The mailed lease payments "relate to the acceptance of the proceeds of the scheme," *id.*, resulting in over $27,000 in profits for Gillion over the lease period. Therefore, we agree with the dis-

trict court that the government presented sufficient evidence for the jury to find that Gillion caused the mails to be used to execute his fraudulent scheme.[4]

### III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

---

[4]Insofar as Appellant challenges the sufficiency of the evidence of his conviction for conspiracy to commit mail fraud in violation of 18 U.S.C. § 371, we reject his challenge for the reasons stated above in Part II.B.1-3. The elements of a conspiracy to commit mail fraud are (1) the existence of an agreement to commit mail fraud, (2) willing participation by the defendant, and (3) an overt act by one of the defendants in furtherance of the agreement. *United States v. Edwards*, 188 F.3d 230, 234 (4th Cir. 1999). The government presented ample evidence that there was an agreement to defraud CitiCapital between DalCanton and Gillion that contemplated the use of the mails, that Gillion willingly participated and often orchestrated the schemes, and that Gillion received checks in furtherance of the agreement within the statute of limitations.